JUDE G. GRAVOIS, Judge.
 

 | ^Defendant, Glen Seals, appeals his conviction for the second degree murder of a cab driver, Ray Feeney, a violation of LSA-R.S. 14:30.1. On appeal, he argues thirty assignments of error. For the following reasons, we affirm defendant’s conviction and sentence.
 

 PROCEDURAL HISTORY
 

 On August 15, 1991, the Jefferson Parish Grand Jury indicted Glen Seals for the first degree murder of a cab driver, Ray Feeney, during the commission of an armed robbery in violation of LSA-R.S. 14:30. In 1993, a twelve-person jury unanimously found defendant guilty as charged and sentenced him to death. The Louisiana Supreme Court subsequently affirmed defendant’s conviction and sentence.
 
 [1]
 

 In 1998, defendant filed an application for post-conviction relief that was granted on the basis that the trial court had, pretrial, ordered a sanity commission |4to determine defendant’s competency to stand trial, which was never held. The trial court held a hearing to determine if a
 
 nunc pro tunc
 
 determination of competency could be made. Finding that the record failed to contain enough evidence upon which to make this determination, the district court vacated defendant’s conviction and sentence and ordered a new trial. The Louisiana Supreme Court affirmed the judgment of the district court, concluding that it could not be retrospectively determined whether defendant had possessed the mental capacity to stand trial.
 
 [2]
 

 
 *300
 
 On June 27, 2006, the State amended the original indictment, reducing the charge from first degree murder to second degree murder in violation of LSA-R.S. 14:30.1. Defendant was arraigned on the amended indictment on September 29, 2006 and pled not guilty. The case was tried from March 17 to March 26, 2009 before a twelve-person jury that unanimously found defendant guilty as charged. On April 3, 2009, defendant’s motion for a new trial was denied. On April 20, 2009, the trial judge sentenced defendant to life imprisonment without the benefit of probation, parole, or suspension of sentence. Defendant filed a motion for appeal on April 3, 2009 that was granted on April 23, 2009.
 

 On appeal, defendant raises thirty assignments of error:
 

 1. The trial court erroneously failed to find a prima facie case of discrimination where the State removed black jurors at a rate twice as high as white jurors, in violation of the Equal Protection Clause.
 

 2. Mr. Seals was denied due process and his right to challenge jurors peremptorily by the trial court’s erroneous refusal to allow back-strikes.
 

 3. The trial court deprived Mr. Seals of his right to put on a defense under the Sixth and Fourteenth Amendments.
 

 4. The trial court erred by refusing to allow Mr. Seals to introduce a material and exculpatory crime scene diagram previously withheld by the State.
 

 |a5. The trial court erred by refusing to allow Mr. Seals to introduce a statement of his party-opponent under La.C.Cr.P. Article 801(D)(2).
 

 6.Mr. Seals was denied his right to confrontation by the trial court’s refusal to allow the defense to impeach an unavailable State witness under La.C.Cr.P. Article 806.
 

 7. The trial court erred by refusing to allow Mr. Seals to recross-examine witnesses when new matters were brought up on redirect.
 

 8. A conviction for second degree murder based on circumstantial evidence consisting of a single eccentric witness and ubiquitous hearsay cannot stand under
 
 Jackson v. Virginia
 
 and the Due Process Clause.
 

 9. The trial court’s repeated admission of out-of-court hearsay testimony, which the defense had no similar opportunity and motive to cross-examine, violated the Sixth and Fourteenth Amendments.
 

 10. The State violated the Confrontation Clause and due process by its elicitation of hearsay testimony to prove robbery.
 

 11. The admission of the testimonial statement of Raymond Feeney violated the Confrontation Clause and due process.
 

 12. The trial court erred by allowing the State to bolster the testimony of its unreliable witnesses by the use of hearsay testimony, in violation of the Due Process Clause and Mr. Seals’ right to a fair trial.
 

 13. The trial court erred by allowing the State to present inadmissible evidence of the victim’s “good character” in its case-in-chief, in violation of the Due Process Clause and Mr. Seals’ right to a fair trial.
 

 14. The State violated due process by improperly disposing of evidence before the defense could examine it and then making affirmative use of it in its case-in-chief.
 

 15. The trial court abused its discretion by refusing to give the requested
 
 *301
 
 spoliation instruction to the jury, in violation of Mr. Seals’ right to put on a defense.
 

 16. The trial court violated due process by failing to inform the jury that the indictment is not evidence when the indictment was read.
 

 17. The trial court erred by giving the jury instructions that relieved the State of its burden of proof, in violation of due process.
 

 18. The trial court erred by refusing to give the defense’s requested instruction in accordance with LSA-R.S. 14:20(D).
 

 19. The trial court erred by giving jury instructions that contained a
 
 Cage
 
 due process violation.
 

 20. The trial court erroneously instructed the jury that it could not nullify its verdict.
 

 |fi21. The trial court erred by giving robbery instructions that lacked the element of criminal intent.
 

 22. The trial court erred by refusing to include negligent homicide as a responsive verdict.
 

 23. The trial court erred by refusing to instruct the jury on accident.
 

 24. The trial court erred by refusing to require a unanimous verdict as to the elements in dispute.
 

 25. Mr. Seals was denied his right to a fair trial in the parish in which the offense occurred.
 

 26. The trial court erred in allowing the State to introduce evidence seized in violation of the Fourth and Fourteenth Amendments and Article I, Section 5 of the Louisiana Constitution.
 

 27. The trial court violated Mr. Seals’ rights under the Fourth, Fifth, and Fourteenth Amendments in allowing the State to introduce two statements of Mr. Seals that were the fruit of an unlawful search and seizure.
 

 28. Discrimination in the selection of the grand jury foreperson violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and requires reversal.
 

 29. The trial court erred by allowing the State to expand the indictment and narrow its burden of proof at trial, in violation of due process and La.C.Cr.P. art. 464.
 

 30. The cumulative effect of the errors requires reversal.
 

 FACTS
 

 The facts from defendant’s first trial as presented by the Louisiana Supreme Court in its previous opinion are very similar to the facts developed in the record of this case. Therefore, the factual summary from that previous opinion is set forth below, with notations of minor differences and additions in testimony:
 

 Minutes before 11:00 p.m. on the evening of July 26,1991, Coca-Cola employee Kevin Belile was driving home after his day’s work.
 
 [3]
 
 As he proceeded homeward, he spotted what appeared to be a shirtless man with blood on his chest lying on the ground on the roadside near the Clearview exit off the Earhart Expressway. Hoping 17to find law enforcement officers to alert, Belile proceeded to the Shoney’s on Clearview Parkway near Elmwood, where he had often noticed Louisiana State Troopers congregated. When he saw there were no police units in Shoney’s lot, Belile proceeded to the Shell Station adjacent to
 
 *302
 
 Shoney’s and used the pay phone to call 911.
 

 After giving the 911 operator his name and reporting what he had seen, Belile returned to the scene to render assistance. When Belile cautiously approached the recumbent form he had seen he queried, “Axe you all right?” The man lying on the roadside rolled over, beseeching help and saying, “I’m dying.” Belile entreated the injured man to calm down and assured him that he had called the police and summoned an ambulance. When the victim asked for something to put his head on, Belile seized a torn brown paper bag full of documents which he saw nearby, which appeared to him to include a cab driver’s trip records,
 
 [4]
 
 and pulled it over to support the injured man’s head.
 

 Because he promptly asked the victim’s name and received a response, Be-lile learned the injured man was Ray Feeney. Receiving an affirmative answer when he asked Feeney if he had been shot, Belile learned from further responses to additional questions that Feeney was a cab driver for Metry Gab Service. Belile asked Feeney if he had been robbed and Feeney gave an affirmative answer. Belile then asked Fee-ney if his assailant was a black man or a white man and the victim responded, “Black.” Belile did not receive a response when he asked Feeney if the assailant mentioned a name, but when he asked Feeney what his assailant looked like and what age and height he appeared to be, Feeney reportedly gave a response stating his assailant was in his thirties and said the man was “five-feet-something.” Belile asked about the assailant’s hair style, prompting a response by querying, “Did he have a big Afro or short hair, short and tight?” Feeney responded, “Short.” When Be-lile asked if the perpetrator had a mustache or any facial hair, Feeney said, |s“Mustache.” Queried about what his assailant wore, and urged to say whether he had on a certain color shirt or pants, Feeney responded, “Red hat.” Although Belile again questioned Fee-ney about the color of the assailant’s shirt, he received no response and, at this point in his trial testimony, explained, “He [Feeney] couldn’t give me an answer. He was kind of on and off.” When the prosecutor asked Belile, ‘Where did you get the experience to ask these kinds of questions?” Belile said, “My dad retired from the N.O.P.D., 17 years, back in, I guess that was, '79 or '80.”
 
 [5]
 

 After the first police officer arrived where Belile and Feeney were located, Belile jumped up off the ground, ran to the officer who was starting to use his radio, and promptly related the victim’s name and occupation, the fact that he was shot, the assailant’s departure in Feeney’s cab, and the description of the assailant and his headgear. In turn, the information was broadcast over police radios.
 

 At the time in question, off-duty Jefferson Parish Sheriffs Office Sgt. Ed Merida
 
 [6]
 
 was monitoring his police radio as he proceeded from a paid detail to his residence. Because he stopped at a con
 
 *303
 
 venience store to buy milk on his way home, Merida’s monitoring was intermittent, but he did hear of the shooting of a cab driver on the Earhart Expressway in a broadcast which described the perpetrator as a “Negro male” with a mustache,
 
 [7]
 
 wearing a red cap. Merida testified that he thereafter heard another broadcast relating the commission of an armed robbery and a vehicle theft involving a black male and a white four door Chevrolet Caprice cab.
 
 [8]
 
 As Meri-da proceeded southbound on Causeway Boulevard, he noted that a white Chevrolet Caprice cab entered Causeway in front of him and also proceeded southbound. As Merida maneuvered his unmarked car to pull up even with this cab to a position from which he could see the driver and try 19to make eye contact, he noticed an African-American male passenger in the front seat who, as he pulled alongside and attempted to make eye contact, slumped down somewhat in the seat in a way which enabled Merida to see that he was wearing a red cap. Defendant Seals was the passenger whom Sgt. Merida observed.
 

 Upon making these observations, Sgt. Merida slowed to position himself behind the cab and radioed headquarters to report his situation and request assistance. Thereafter, Sgt. Merida activated his flashing lights and siren, stopped the cab, and ordered both occupants out of the vehicle. Sgt. Merida then observed a plastic
 
 [9]
 
 bag in the front passenger side of the cab, filled with clothing which appeared to be bloodstained. Sgt. Merida testified that the defendant immediately attempted to discuss the reason for the stop and the contents of the bag in the front of the cab, explaining the clothing became bloodied as a result of a fight. Sgt. Merida testified that he told Seals he had no desire to talk with him in reference to what he observed and then advised Seals of his Miranda
 
 [10]
 
 rights.
 

 Among the back-up officers responding to Sgt. Merida’s call for assistance was Sgt. Glenn Toca, who was then assigned to the armed robbery squad. After Sgt. Toca talked to Sgt. Merida and learned of bloody items located in the cab and blood on Glen Seals, Sgt. Toca addressed Seals, advising him of the Feeney investigation which he was conducting and again apprising him of his
 
 Miranda
 
 rights, which Sgt. Toca said Seals waived. Sgt. Toca testified that after he interviewed Seals at the scene of the Causeway Boulevard stop, Seals agreed to accompany law enforcement officers to the Detective Bureau in Harvey for a further interview. The interview led to a statement made at 2:15 a.m. in which defendant recounted his presence at a fight between his friend, a man named Shorty, and a Caucasian man who cut Shorty with a broken bottle for allegedly selling him “bunk” instead of drugs as an explanation of how
 
 *304
 
 the apparel he carried came to be bloodstained. The interview encompassed queries about the defendant’s possession of a set of keys |infound in his pocket, keys the defendant claimed he did not recognize and which presence in his pocket he said he could not explain.
 

 Jefferson law enforcement officials showed these keys to Michael Grayson, the owner of the cab Ray Feeney was leasing and driving at the time he was fatally shot. Mr. Grayson identified the keys as belonging to Feeney’s Metry cab. Sgt. Toca testified that it was after learning the keys found in defendant’s possession were the keys to Feeney’s cab that he resumed interviewing defendant and sought the second statement. In giving the second statement, the defendant denied robbing Feeney, admitted he shot him, and insisted that he acted in self-defense.
 

 The autopsy performed by pathologist Dr. Fraser MacKenzie revealed five gunshot wounds, two of which, wounds to the body, were the cause of Ray Feeney’s death. There was one “grazing” facial gunshot wound and one gunshot wound to each hand. In his statement admitting the shooting, Seals claimed that when Feeney’s cab, which he hired in Metairie, brought him to “Pigeon Town” in the Carrollton area and stopped there as he directed, he turned to look outside the cab at a person proceeding toward it whom he first thought was his friend, Shorty. After he saw the approaching person was not Shorty, Seals refocused his attention on the front of the cab and Feeney to find that Feeney had drawn his gun, was aiming at him, and ordered him to pay his fare and exit the cab. In this statement, Seals related that his response was to grab the gun and tussle with the driver in such a way that he vaulted into the front seat, after which time the gun went off and the driver was wounded.
 

 Seals insisted this first shot did not faze Feeney, then related that from his new vantage in the driver’s seat, he cranked the car and put it into gear. Seals asserted that Feeney renewed their tussle for the gun and killed the car’s engine, ordering him to leave the cab. Seals related that he was determined not to get out, and gave a number of reasons for his resolve.
 

 Seals’ statement next recounted that he then drove down Earhart and his tussling over the gun with the cab driver resumed and ^resulted in the repeated discharge of the gun. Seals related that when the cab arrived at the Clearview exit, Feeney opened the door to jump out, prompting Seals to apply the brakes. While the cab was still moving, Feeney did exit the cab and Seals continued to drive the cab, which now contained the gun he knew to be “empty” (because, before Feeney jumped, the gun “clicked,” signifying to Seals that it did not contain any other bullets).
 

 After going to his sister’s neighborhood, abandoning the cab and discarding the gun, Seals visited his sister’s home, where he washed himself and donned clean clothes. From this New Orleans East location, Seals called a White Fleet cab in which he traveled to Metairie with his bloodstained articles of apparel. It was this taxi which Sgt. Merida observed and stopped on Causeway Boulevard within a couple of hours of the shooting. After the completion of the interview which culminated in Seals’ admissions, the Jefferson Parish Sheriffs Office personnel investigating the Fee-ney case arrested Seals[.]
 
 [11]
 

 
 *305
 

 ASSIGNMENT OF ERROR NUMBER EIGHT
 
 — Sufficiency
 
 of the evidence
 

 A conviction for second degree murder based on circumstantial evidence consisting of a single eccentric witness and ubiquitous hearsay cannot stand under Jackson v. Virginia and the Due Process Clause.
 

 In this assignment of error, defendant argues that the evidence was insufficient to convict him of either robbery or intentional murder.
 

 When the issues on appeal relate to both the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence.
 
 [12]
 
 If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an 112acquittal, and no further inquiry as to trial errors is necessary.
 
 [13]
 
 Therefore, we will address sufficiency of the evidence first.
 

 Defendant argues that the circumstantial evidence involved in this case was legally insufficient to support a conviction for second degree murder. He contends that the State’s case was comprised of the inconsistent, incredible, and unreliable testimony of Kevin Belile and a confluence of hearsay evidence through Mr. Belile and others. Defendant further contends that there was insufficient evidence of robbery, and that the State failed to exclude every reasonable hypothesis of innocence regarding the robbery element of second degree murder. Lastly, defendant asserts that there was insufficient evidence of intentional murder.
 

 The State responds that a rational trier of fact could have found that the evidence was sufficient to convict defendant of second degree murder under either the specific intent theory or under the felony-murder theory based upon armed robbery, first degree robbery, and/or simple robbery. The State also responds that a rational trier of fact could have found that defendant did not act in self-defense.
 

 The constitutional standard for testing the sufficiency of the evidence, as enunciated in
 
 Jackson v. Virginia,
 

 [14]
 

 is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
 
 [15]
 
 Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.
 
 [16]
 

 Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the 11sexistence of other connected facts.
 
 [17]
 
 The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hy
 
 *306
 
 pothesis of innocence.
 
 [18]
 
 On appeal, the reviewing court does not determine if another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events. Instead, the appellate court must evaluate the evidence in a light most favorable to the State and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.
 
 [19]
 
 The reviewing court must not impinge on the jury’s finding of fact, in a criminal case, except to the extent necessary to guarantee constitutional due process.
 
 [20]
 

 Under LSA-R.S. 14:30.1, second degree murder is defined as the killing of a human being when the offender: 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, including armed robbery, first degree robbery, and simply robbery, even though he has no intent to kill or to inflict great bodily harm.
 

 In this case, according to the jury instructions, the State prosecuted this case under both theories of murder: specific intent murder and murder while committing or attempting to commit armed robbery, first degree robbery, or simple robbery. Under the first theory of second degree murder, the State had to prove that defendant had the specific intent to kill or to inflict great bodily harm. Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or | l4failure to act.”
 
 [21]
 
 The determination of specific intent is a question of fact. Specific intent may be inferred from the circumstances and from the defendant’s actions, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries.
 
 [22]
 

 Under the second theory of second degree murder, the State had to prove that defendant was engaged in the perpetration or attempted perpetration of armed robbery, first degree robbery, or simple robbery, even though he had no intent to kill or to inflict great bodily harm. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
 
 [23]
 
 First degree robbery is the taking of anything of value belonging to another from the person of another, or that is in the immediate control of another, by use of force or intimidation, when the offender leads the victim to reasonably believe he is armed with a dangerous weapon.
 
 [24]
 
 Simple robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, but not armed with a dangerous weapon.
 
 [25]
 

 When a defendant in a homicide prosecution claims self-defense, the burden is on the State to prove beyond a reason
 
 *307
 
 able doubt that the defendant did not act in self-defense.
 
 [26]
 
 According to LSA-R.S. 14:20(1), a homicide is justifiable “[w]hen committed in self-defense by one who reasonably believes that he is in imminent |1fidanger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.”
 
 [27]
 

 Sufficiency of evidence of robbery
 

 Defendant argues that there was insufficient evidence of robbery. He contends that Mr. Belile’s testimony that the victim told him he was robbed was not credible because there was no record that a 911 call was made from the Shell Station on the date in question even though Mr. Belile claimed he made one, Mr. Belile’s description of the victim as a 110-pound man was incorrect, and Mr. Belile’s testimony regarding the time it took for events to transpire that night was unbelievable. Defendant further contends that the fact that he was arrested with cash was insufficient to prove robbery. He states that the State failed to exclude every reasonable hypothesis of innocence, noting that he presented reliable evidence showing why he had money in his pocket at the time of arrest. Defendant also asserts that there was no direct evidence that the victim had cash with him at the time he was killed.
 

 The State presented several witnesses to establish that defendant robbed the victim. Mr. Belile testified that the victim, while dying, told him that he had been robbed. Dr. Fraser MacKenzie testified that below the victim’s right ear lobe was a circular wound that could have been consistent with someone sticking a weapon on the back right of the victim’s head. Defendant admitted in his second statement that he took the victim’s cab and gun and left the victim on the side of the road. The keys to the victim’s cab were found in defendant’s pocket when he was arrested. Detective Reed Cheramie testified that the victim only had a one-dollar bill and a two-dollar bill in his wallet.
 

 | ifiCaptain Maggie Pernia testified that when defendant emptied his pockets at the detective bureau, he had several bills with what looked like blood on them. She identified State’s Exhibits 42 through 45 as photographs of the money that defendant removed from his pocket. Those photographs showed that defendant was in possession of twenty-five one-dollar bills, five five-dollar bills, and one ten-dollar bill.
 
 [28]
 
 Lt. Norman Schultz also saw bloody money on the seat of the White Fleet cab — two twenty-dollar bills and two ten-dollar bills. Dr. Ronald Singer, a defense expert in blood stain analysis, testified that there was “certainly a possibility” that since there was additional blood on the inside of defendant’s pocket, the bloody money was folded and put into that pocket and the blood transferred from the money to the inside of the pocket.
 

 Eddie Lecourt, Mr. Feeney’s dispatcher, testified that the cab company’s daily logbook showed that Mr. Feeney had twelve fares during the afternoon and evening in question, and that in 1991, each fare would have averaged approximately seven or eight dollars, for a total of approximately
 
 *308
 
 $96.00. He also explained that cab drivers would start out with approximately twenty to forty dollars in small denominations so they could make change for their fares.
 

 Michael Grayson, from whom Mr. Fee-ney leased the cab he was driving on the date he was killed, further explained that a cab driver would keep ones, fives, and tens. Mr. Grayson testified that Mr. Fee-ney paid him approximately $175.00 to $185.00 a week to lease his cab, and that he usually paid him on Fridays, and sometimes on Saturdays. Mr. Grayson said that Mr. Feeney was supposed to pay him on the Friday he was killed; however, Mr. Feeney never arrived to pay him. He maintained that Mr. Feeney always paid. Additionally, the testimony of Mrs. 117Margaret Feeney, Mr. Feeney’s wife, tended to establish that Mr. Feeney had money with him on the evening in question.
 

 On the other hand, defendant presented the testimony of Gerald Kirkwood to show that the
 
 money in
 
 defendant’s possession was his own. Mr. Kirkwood testified that defendant started working for him as a carpet installer in the fall of 1990, and that in July of 1991, defendant was being paid $850.00 per week every Friday. Mr. Kirk-wood explained that he gave defendant an advance of $100.00 on July 24, 1991 because defendant requested it in order to pay some urgent bills. He also explained that on July 26, 1991 (the day the victim was killed), he paid defendant $60.00 in cash at lunchtime and $190.00 by check at about 6:30 p.m.
 

 We find that a rational trier of fact could have found that the evidence was sufficient under the
 
 Jackson
 
 standard to prove that defendant was engaged in either armed robbery, first degree robbery, and/or simple robbery when the victim was killed, and that every reasonable hypothesis of innocence was excluded. The State’s evidence, particularly the denominations of the bills that were found on defendant, was strong and compelling that defendant robbed Mr. Feeney.
 
 [29]
 
 Further, Mr. Kirk-wood’s testimony that he had advanced defendant some money to pay urgent bills indicates that defendant had a need for money on the day in question, and as such refutes, rather than supports, defendant’s claim that he had no motive for robbery.
 

 |,Sufficiency of proof of intent
 

 Defendant also argues that the State did not produce any witnesses to testify that he had the specific intent to kill the victim. Defendant contends that the physical evidence was consistent with his argument that he shot the victim in self-defense during a struggle over the gun. The record, however, does not support defendant’s contention.
 

 The record shows that at the time of the victim’s death, the victim was 58 years old and defendant was 27 years old. Dr. Fraser MacKenzie testified that the victim was shot five times- — twice in the chest, once in each hand, and once in the face.
 
 *309
 
 However, according to Captain Pernia and other witnesses who saw defendant the night of his arrest, defendant did not sustain any injuries at all. Dr. MacKenzie testified that if two people were struggling over a weapon, he would have expected to see some evidence of such struggle on both persons.
 

 Dr. MacKenzie also testified that he would expect to see stippling (which he explained was gunpowder burned into the skin when a pellet is expelled from a weapon) usually within two feet of the target if there were not any intervening materials. He stated that the victim had stippling on his nose and upper lip, indicating that the muzzle had to have been within two feet of that area without any intervening material. Dr. MacKenzie found no stippling inside the wounds to the victim’s chest or to the victim’s hands, and therefore, he believed that the muzzle was more than two feet away from those areas without any intervening material. He testified that in his opinion, the wounds could not have occurred as a result of the victim grabbing the gun during a struggle.
 
 [30]
 

 119Pr. Ronald Singer, the defense expert in the field of firearms and tool mark identification, testified that because there was no stippling on the victim’s wrists and arms, it would stand to reason that when the victim was shot, his hands were not on the weapon. He further testified that the lack of stippling on the victim’s hands made it inconsistent with defendant’s story that the victim was holding the gun at the time it was fired. It is noted, however, that Dr. Singer testified that he did not think it was possible to determine the distance from which the victim was shot with any degree of accuracy.
 

 John Lewoczko, the State’s expert in the field of firearms and tool mark identification, testified that if two people were fighting over a gun and one had his hand on the barrel, he would expect to find a gunshot residue pattern on the victim’s clothing. He examined the victim’s peach shirt, white t-shirt, and blue pants, and defendant’s khaki pants and black t-shirt; however, he found no gunshot residue pattern. His opinion was that the shots were fired at a distance of greater than three feet from Mr. Feeney. Captain Louise Walzer, another State expert in the field of firearms and tool mark identification, testified that she would have expected to see a gunshot residue pattern within two feet (for lead residue) if defendant and the victim were struggling over the gun.
 

 Additionally, defendant apparently lied to the police in his first statement. After being confronted with the information that the officers knew he had the keys to the victim’s cab in his pocket, defendant then gave a self-serving statement claiming self-defense.
 

 We find that a rational trier of fact could have found that the State’s evidence was sufficient under the
 
 Jackson
 
 standard to prove that defendant had the specific intent to kill or inflict great bodily harm to the victim, and that he did not shoot the victim in self-defense. The physical evidence regarding stippling and |Mgunshot residue patterns did not support defendant’s contention that he shot Mr. Feeney while “tussling” over the gun, but rather
 
 *310
 
 supported a finding that defendant shot an unarmed man who did not have his hands on the gun and who was likely at least two feet away from the gun and defendant’s person. The physical evidence does not support defendant’s self-serving narrative in his second statement about the manner in which he claimed they fought over the gun. Further, the number of shots fired and the number of wounds to Mr. Feeney, combined with the lack of any wounds to defendant, further discredits defendant’s position and supports the State’s evidence that defendant had the requisite specific intent to kill while in possession of the gun.
 

 In sum, the State presented witnesses to prove that defendant committed second degree murder either under the specific intent theory or the felony-murder theory based on robbery. The defense contended that the shooting was committed in self-defense. The jury apparently found the State’s witnesses credible and rejected defendant’s version of the events. The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; therefore, the credibility of witnesses will not be reweighed on appeal.
 
 [31]
 

 This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER ONE
 
 — Improper
 
 jury selection
 
 — Batson
 
 claims
 

 The trial court erroneously failed to find a prima facie case of discrimination where the State removed black jurors at a rate twice as high as white jurors, in violation of the Equal Protection Clause.
 

 In this assignment of error, defendant argues that the trial court should have found a prima facie case of discrimination by the prosecution in jury selection, that 12i the trial court erred by providing its own race-neutral reasons for the prosecution’s discriminatory challenges in two instances (jurors Sabrina Lewis and Christopher Williams), and that no race-neutral reason was provided for three of the discriminatory challenges (jurors Edmond Bocage, Byron Davis, and Esmaria Henry). Defendant further argues that the State’s use of three-out-of-four, and then five-out-of-seven, peremptory challenges on black jurors clearly evidenced a “pattern of strikes” against black jurors, especially considering the fact that white persons in the venire outnumbered black persons three-to-one.
 

 The State responds that the trial judge did not err by finding that defendant failed to make a prima facie case of discrimination.
 

 In
 
 Batson v.
 
 Kentucky,
 
 [32]
 
 the United States Supreme Court held that the Equal Protection Clause prohibits the peremptory challenge of a prospective juror based on race. In
 
 Batson,
 
 the Supreme Court set forth a three-step analysis to determine whether the jury selection was made in an impermissibly discriminatory manner.
 

 First, a defendant must establish a pri-ma facie case of discrimination by showing facts and relevant circumstances that raise an inference that the prosecutor used his or her peremptory challenges to exclude potential jurors on the basis of race.
 
 [33]
 
 In
 
 *311
 
 establishing his prima facie case, the defendant may offer any facts relevant to the question of the prosecutor’s discriminatory intent to satisfy this burden.
 
 [34]
 
 Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class |2gwhich is alleged to be the victim of purposeful discrimination.
 
 [35]
 
 If the defendant fails to make a prima facie case, then the challenge fails.
 
 [36]
 

 Second, if a prima facie case is established, the burden shifts to the State to come forward with a race-neutral explanation for its peremptory challenges.
 
 [37]
 
 To be facially valid, the prosecutor’s explanation need not be persuasive, or even plausible; thus, unless the discriminatory intent is inherent in the prosecutor’s explanation, the reason will be deemed race-neutral.
 
 [38]
 
 Whether the State’s reasons are substantial, and more importantly, whether they are substantiated by the record, are questions for the third stage in the
 
 Batson
 
 analysis.
 
 [39]
 

 Third, if a race-neutral explanation is tendered, then the trial court must determine whether the defendant has established purposeful discrimination.
 
 [40]
 
 It is at this stage of the analysis that persuasiveness of the race-neutral explanation comes into play. The question is “whether the defendant’s proof, when weighed against the prosecutor’s proffered race-neutral reasons, is sufficient to persuade the trial court that such discriminatory intent is present.”
 
 [41]
 
 The focus is upon the intent of the prosecutor at the time the peremptory strike was used.
 
 [42]
 

 A trial judge’s findings on a claim of purposeful discrimination are entitled to great deference by the reviewing court because they depend largely on credibility evaluations.
 
 [43]
 
 The trial judge has the advantage of observing the characteristics and demeanor of the attorneys and prospective jurors, and therefore, the trial court occupies the best position for deciding whether a discriminatory 12sobjective underlies the peremptory challenges.
 
 [44]
 
 An appellate court should not substitute its evaluation of the record for that of the trial judge.
 
 [45]
 
 However, a single instance of race discrimination during the jury selection process, which is not identified and
 
 *312
 
 corrected by the trial court, constitutes reversible error.
 
 [46]
 

 In this case, the record reflects that two panels of approximately twenty prospective jurors each were examined during
 
 voir dire.
 
 The record does not clearly reflect the race of all of the prospective jurors. The State used five peremptory challenges in the first panel, three of which were used to excuse black jurors — Esma-ria Henry, Byron Davis, and Edmond Bo-cage. The State used its sixth and seventh peremptory challenges in the second panel to exclude Sabrina Lewis and Christopher Williams, who were black.
 

 After the jury was chosen and sworn, defense counsel noted that the jury was comprised of five black persons, one Hispanic person, and two black persons as alternates. Defendant contends in brief that the white persons in the venire outnumbered black persons “three-to-one” and the venire was only “a quarter black.” This Court notes, however, that the twelve-person jury was comprised of forty-two percent black persons, fifty percent white persons, and eight percent Hispanic persons, which shows that black persons were selected to serve in numbers substantially exceeding what defendant contends to be the percentage of the venire they comprised.
 

 On appeal, defendant challenges the trial judge’s rulings as to Ms. Henry, Mr. Davis, Mr. Bocage, Ms. Lewis, and Mr. Williams.
 

 In applying the Batson analysis to this case, the issue is whether the trial judge erred by finding that defendant did not make a prima facie showing that the l^prosecutor used his peremptory challenges to exclude those potential jurors on the basis of race.
 
 [47]
 
 It is noted that three of the jurors (Ms. Henry, Ms. Lewis, and Mr. Williams) were challenged for cause by the prosecution, which the trial court denied in each case.
 

 With regard to Ms. Henry, the record does not show that the trial judge erred by failing to find a prima facie case of discrimination. Ms. Henry stated that her husband, who was a pastor, had passed away, and that she did not judge people because of her religion. The prosecutor then asked Ms. Henry whether she would be able to judge a person’s actions and determine whether that person was guilty of a crime where that person could go to prison for life. Ms. Henry responded, “I don’t know. No, I don’t think so.” When the prosecutor asked the other jurors on the first panel whether anyone else felt that way, there was no response.
 

 Later on, defense counsel told Ms. Henry that jurors were not there to decide whether defendant was a good person or a bad person, and that jurors were there to decide whether the State had proven guilt beyond a reasonable doubt. Ms. Henry, said, “Uh-huh (affirmative response),” and “Right.” Defense counsel said that they did not sit in judgment of another human being, rather, they sat in judgment of the evidence presented by the State. The record reflects that Ms. Henry said, “Uh-huh (affirmative response).” When defense counsel asked Ms. Henry if she could judge a person’s actions by way of the evidence, she said, “Yes.”
 

 In light of the foregoing, we find that the record does not reflect that the prosecutor’s reasons for excusing Ms. Henry, i.e., that she did not want to judge others,
 
 *313
 
 were a pretext for race. The prosecutor was concerned about all the prospective jurors’ feelings about sitting in judgment of another, and the | ?J,prosecutor had already challenged Ms. Henry for cause based on her inability to judge others.
 
 [48]
 

 Additionally, Ms. Henry indicated that she suffered from several medical conditions that would make it hard for her to serve as a juror. Although other jurors had some medical issues, none of them indicated that those medical issues could prevent them from coming to court to serve as a juror. Numerous other jurisdictions have held that the concern about inattentiveness of a potential juror because of a medical condition, and about his or her inability to sit through the course of a trial because of the condition, is a race-neutral reason.
 
 [49]
 

 With respect to Mr. Davis and Mr. Bocage, the record does not reflect that the trial judge erred by failing to find a prima facie case of discrimination. Both Mr. Davis and Mr. Bocage had serious concerns about missing work and not being paid while on jury duty. As such, those jurors could have been distracted during the trial by thoughts of wanting to return to work to earn money and not pay attention to the evidence. Other than Mr. Davis and Mr. Bocage, none of the other jurors expressed concerns about missing work and not getting paid.
 
 [50]
 

 There were other race-neutral reasons found in the record to support the prosecutor’s use of a peremptory challenge on Mr. Davis. Mr. Davis thought that some police officers would lie on the witness stand to protect other officers. He said he had a hard time believing anybody. At one point, the prosecutor asked Mr. Davis if he knew defendant because he noticed Mr. Davis looking at defendant a 12fiCouple of times. Although Mr. Davis said he did not recognize defendant, he later directly asked defendant his name.
 

 As to Ms. Lewis, the record does not reflect that the trial judge erred by failing to find a prima facie case of discrimination. During
 
 voir dire
 
 of the second panel, Ms. Lewis stated that she believed that the presentation of two different stories or two different versions of events automatically showed reasonable doubt. The prosecutor then asked if anybody else thought that. He noted that four other people also indicated that two different versions automatically resulted in reasonable doubt. Their identities and races are not in the record.
 

 The prosecutor then questioned prospective juror Justin Villars, who disagreed with Ms. Lewis. Afterward, the prosecutor discussed how he hoped the jurors would use common sense and judge the credibility of witnesses. He stressed that the State had to prove guilt beyond a
 
 *314
 
 reasonable doubt. Defense counsel later asked Ms. Lewis if she could follow the law and hold the State to its burden to prove beyond a reasonable doubt and not weigh the stories “that way,” and she said, “Yes.” Defense counsel again asked Ms. Lewis if she would look at the evidence and decide whether the State had proven its case beyond a reasonable doubt, and she said, “Yes.”
 

 In
 
 State v. Gant,
 

 [51]
 

 the State challenged juror Washington for cause, alleging that he misunderstood reasonable doubt and wanted the State to prove more than the law required. The State used a peremptory challenge to excuse him after its cause challenge was denied. This Court found that the trial judge did not err in denying the defendant’s
 
 Batson
 
 challenge.
 
 [52]
 

 |?7In light of the foregoing, we find that the record does not reflect that the prosecutor’s reason for excusing Ms. Lewis, that she misunderstood reasonable doubt, were a pretext for race.
 

 The record further does not support defendant’s contention that the trial judge erred by failing to find a prima facie case of discrimination with respect to Mr. Williams. Mr. Williams stated during
 
 voir dire
 
 that he had been convicted of a felony in 1990, and that he did not receive a first offender pardon. He further stated that he had not been treated fairly in his case, and in fact, he was treated “wrongly” by the police. However, Mr. Williams stated that that would not be a problem “here.” Prior criminal history has long been considered a valid reason to peremptorily excuse a prospective juror.
 
 [53]
 

 In sum, the trial judge found that the defense did not make a prima facie showing of discriminatory
 
 intent
 
 with respect to potential jurors Ms. Henry, Mr. Davis, Mr. Bocage, Ms. Lewis, and Mr. Williams. As such, the trial judge did not require the State to provide race-neutral reasons for those challenges. However, three of those five potential jurors were challenged for cause, and therefore, the trial judge already knew why the State was using peremptory challenges to exclude them.
 

 The record shows that the trial judge paid close attention to the responses of each potential juror during
 
 voir dire.
 
 In view of the vast amount of discretion accorded the findings of the trial court in assessing intent and judging credibility, we find that the trial judge did not err in failing to find a prima facie case of discrimination was made with respect to the five prospective jurors in question. Accordingly, defendant has failed to carry his burden of proving purposeful discrimination with regard to those prospective jurors.
 

 lagThis assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER TWO
 
 — Refusal
 
 to allow backstrikes
 

 Mr. Seals was denied due process and his right to challenge jurors peremptorily by the trial court’s erroneous refusal to allow backstrikes.
 

 Here, defendant argues that he was denied the right to challenge jurors peremptorily by the trial court’s erroneous refusal to allow backstrikes in that defendant was prohibited from exercising backstrikes, the denial of backstrikes deprived defendant of
 
 *315
 
 his right to exercise peremptory strikes and resulted in at least two obnoxious jurors sitting on the jury, and the trial court’s rulings on the challenges for cause were independent error.
 

 Defendant argues that the trial judge erred in denying him the right to peremptorily backstrike jurors during jury selection. He contends that as a result, at least two biased jurors were seated, Christine Henderson and Sandra Boudreaux, both of whom indicated they would automatically credit the testimony of a police officer. The State responds that any error in disallowing the backstriking of prospective jurors was harmless.
 

 Defendant further argues that the trial judge erred by denying his cause challenges as to Ms. Henderson and Ms. Bou-dreaux. The State responds that this error was not preserved for appeal because defendant did not object to the denial of the cause challenges as to these two jurors, nor did defendant use all of his peremptory challenges. Alternatively, the State responds that the trial judge did not err by denying those challenges for cause.
 

 An accused has a constitutionally guaranteed right to peremptorily challenge jurors.
 
 [54]
 
 When, however, the jury panel is not sworn until all individual jurors and | ^alternates have been selected,
 
 [55]
 
 peremptory challenges may be exercised even after tendering of jurors under LSA-C.Cr.P. art. 788(A).
 
 [56]
 
 In other words, in Louisiana, peremptory challenges are exercisable at any time before the entire jury panel is sworn.
 

 Backstriking is the term for a party’s exercise of a peremptory challenge to strike a prospective juror after initially accepting him.
 
 [57]
 
 While a defendant has a constitutional right under the Louisiana State Constitution to peremptorily strike prospective jurors, there is no constitutional right to backstrike, only a statutory right.
 
 [58]
 

 Backstriking of jurors is authorized by LSA-C.Cr.P. art. 799.1,
 
 [59]
 
 which provides:
 

 Notwithstanding any other provision of law to the contrary, and specifically notwithstanding the provisions of Article 788, in the jury selection process, the state and the defendant may exercise all peremptory challenges available to each side, respectively, prior to the full complement of jurors being seated and before being sworn in by the court, and the state or the defendant may exercise any remaining peremptory challenge to one or more of the jurors previously accepted. No juror shall be sworn in until both parties agree on the jury composition or have exercised all challenges available to them, unless otherwise agreed to by the parties.
 

 
 *316
 
 Courts have routinely held that the failure to allow a party to backstrike is error, but such error is subject to a harmless error test.
 
 [60]
 

 In
 
 State v. Taylor, supra,
 
 the Supreme Court found it harmless error that the trial court refused to allow the defense to back-strike jurors, since the
 
 voir dire
 
 as a |3nwhole showed that defendant had ample opportunity to examine prospective jurors, to challenge them for cause, and to peremptorily challenge them.
 
 [61]
 

 Likewise, in
 
 State v. Plaisance, supra,
 
 the Fourth Circuit could not say that the defendant was prejudiced by the trial court’s error of prohibiting backstriking, noting that the record reflected that defense counsel thoroughly questioned the jurors during the general
 
 voir dire,
 
 that other than the denial of backstrikes, the defendant was afforded a right to full general
 
 voir dire,
 
 that the defendant failed to identify from the first panel a specific juror whom he would have backstruck, and that the record did not reflect any unsuitable jurors from the first panel.
 
 [62]
 

 In
 
 State v. Hailey, supra,
 
 the Fourth Circuit noted that only ten of the twelve jurors needed to vote to convict in order to return a guilty verdict; however, the jury verdict was unanimous. Therefore, the appellate court found that even assuming that the two jurors who were the focus of the appellate argument had been replaced with jurors who would have ignored the compelling evidence against defendant and voted not guilty, the other ten guilty votes would have been sufficient to convict. Moreover, the appellate court concluded that given the overwhelming evidence against defendant, any rational juror would have found him guilty as charged. For those reasons, the Fourth Circuit found the trial court’s error in failing to allow backstrikes harmless.
 
 [63]
 

 In this case, after the twelve-person jury was chosen, defense counsel attempted to use a backstrike, but the trial judge denied it, stating that his policy was that once twelve jurors were chosen, no backstrikes could be used. Defense counsel objected to the panel based on LSA-C.Cr.P. art. 799.1, arguing that |S1 defendant was entitled to use his peremptory strikes any time until the jury was sworn. The trial court disagreed and the entire jury was then sworn in.
 

 At a hearing on the issue the next morning, the option of declaring a mistrial, based on the issue of the denial of back-strikes, was discussed. Defense counsel objected to a mistrial, noting his thorough trial preparation, including the presence of out-of-town witnesses. The prosecutor said he took no position regarding the mistrial. Defense counsel stated that if he had to choose between a mistrial or the waiving of defendant’s Article 799.1 rights, then he would choose to waive the Article 799.1 rights and go forward with the selected and sworn jury.
 

 After hearing the arguments of counsel, the trial judge explained that the failure to allow backstriking was subject to the harmless error rule. The trial judge then said he was not going to grant a mistrial,
 
 *317
 
 and they were going to go forward with the trial.
 

 We find that the trial judge erred by denying defense counsel the right to use backstrikes after the twelfth juror was selected. At the time defense counsel asked to backstrike a juror, he had nine peremptory challenges remaining. Nevertheless, the error was harmless. The
 
 voir dire
 
 as a whole shows that defendant had ample opportunity to examine prospective jurors, to challenge them for cause, and to peremptorily challenge them.
 
 Taylor, supra.
 
 Additionally, as in
 
 Hailey, supra,
 
 defendant in this case was tried for second degree murder, and the jury verdict was unanimous.
 
 [64]
 
 Therefore, even if Ms. Henderson and Ms. Boudreaux would have been replaced with jurors who would have ignored the compelling evidence against defendant and voted not guilty, the other ten guilty votes would have been sufficient to convict.
 

 |S2A1so, defense counsel did not, at any point during the jury selection process or at the conclusion thereof, specify any jurors in particular that he would have struck.
 
 Hailey, supra.
 
 The record reflects that after Ms. Conner, defense counsel, accepted Ms. Boudreaux, Mr. Singer, defendant’s other counsel, asked whether they were going to exercise a peremptory challenge on her, but then he said, “we’ll see.” Later on, after the State accepted Ms. Henderson, Mr. Singer said, “That’s good for now,” and Ms. Conner said, “Acceptable.” None of the responses by defense counsel specifically show that defense counsel would have used a backstrike to remove Ms. Boudreaux or Ms. Henderson.
 

 Further, given the overwhelming evidence against defendant, any rational juror would have found him guilty as charged.
 
 Hailey, supra.
 
 Accordingly, we find that the trial judge’s error in failing to allow backstrikes was harmless.
 

 Also, we agree with the State that because defendant did not object to the denial of the cause challenges as to these two jurors, defendant’s assignment of error with respect to the cause challenges was not preserved for appeal.
 
 [65]
 

 This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER THREE
 
 — Deprivation
 
 of right to put on a defense (as a preface to Assignments of Error Nos. Four, Five, Six, and Seven)
 

 The trial court deprived Mr. Seals of Ms right to put on a defense under the Sixth and Fourteenth Amendments.
 

 As a preface to Assignments of Error Nos. Four
 
 (refusal to allow introduction of alleged crime scene
 
 diagram), Five
 
 (refusal to allow introduction of alleged statement of
 
 party-opponent), Six
 
 (refusal to allow impeachment of an unavailable witness
 
 ), and Seven
 
 (denial of right to recross-examination of ^witnesses),
 
 fully set forth and analyzed below, defendant argues that the trial court deprived him of his constitutional right to present a defense.
 

 ASSIGNMENT OF ERROR NUMBER FOUR
 
 — Refusal
 
 to allow introduction of alleged crime scene diagram
 

 The trial court erred by refusing to allow Mr. Seals to introduce a material and exculpatory crime scene diagram previously withheld by the State.
 

 
 *318
 
 In this assignment of error, defendant argues that the trial judge erred by refusing to admit into evidence a diagram of a cab found in the State’s file. He contends that this diagram was critical to prove his theory that the shots were fired in self-defense during a struggle over the gun inside the cab, rather than during an execution-style hit with shots being fired outside the cab as was argued by the State at the first trial.
 
 [66]
 
 Defendant further contends that the error was not harmless. He also argues that the trial judge erred by refusing to admit the prosecutor’s previous stipulation that the diagram was created by a State crime scene technician, which defendant characterizes as an admission by a party-opponent.
 

 The State responds that the trial judge did not err by excluding the diagram because no one was able to establish the identity of the person who drew the diagram, at what point the diagram was made, or whether the person who created it was doing so from firsthand knowledge. The State further responds that there was no previous stipulation regarding the diagram because the defense did not accept or even acknowledge the proposed stipulation, and therefore, both the diagram and the proposed stipulation were properly excluded. Alternatively, the State contends that any error was harmless since there was other evidence to establish the victim was shot inside the cab.
 

 |a^Both the Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee a criminal defendant the right to present a defense.
 
 [67]
 
 However, the right to present a defense does not require the trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice.
 
 [68]
 

 Relevant evidence is defined by LSA-C.E. art. 401 as “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Generally, all relevant evidence is admissible.
 
 [69]
 
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
 
 [70]
 

 Before demonstrative evidence can be admitted at trial, however, it must be properly authenticated.
 
 [71]
 
 The identification can be visual, through testimony.
 
 [72]
 
 The identification can also be accomplished through chain of custody, by tracing the object from the time it was seized to the time it was offered into evidence.
 
 [73]
 
 It is sufficient if the evidence shows it is more
 
 *319
 
 likely than not that the object is one connected with the case.
 
 [74]
 
 A lack of positive identification of demonstrative evidence or its chain of custody goes to the weight of the evidence, not to its admissibility, and the connection of that evidence to the case is a factual matter to |aBbe determined by the trier of fact.
 
 [75]
 
 Diagrams are generally admissible to aid the jury if shown to be accurate representations of the subject matter in question, and the ruling of the trial court relative to admissibility will not be disturbed on appeal unless there has been an abuse of discretion.
 
 [76]
 

 We find that the trial judge did not err by denying defendant’s motion to admit the diagram of a cab into evidence at trial. First of all, the diagram was not properly authenticated. None of the witnesses testified at trial that they drew the diagram or knew the identity of the person who drew it or when it was drawn. Detective Reed Cheramie testified that he directed Don Carson, a crime scene technician, to process and photograph the cab. However, he did not direct Mr. Carson to draw a diagram of the cab, nor did he draw one himself. Mr. Carson testified that he processed and photographed the cab, but that he did not prepare a scene sketch in this case, nor did he know who prepared this diagram nor where it came from.
 

 Defendant’s attorney for post-conviction relief, James Lohman, testified that he found the diagram in the D.A.’s file that he reviewed in 1997 in the D.A.’s office in order to prepare the application for post-conviction relief. However, Ronald Bo-denheimer and James Williams, the former prosecutors, established at pretrial hearings that they did not prepare the diagram and had no recollection of seeing the diagram.
 

 Additionally, none of the witnesses testified at trial that the diagram was an accurate representation of the subject matter in question. Although Detective Cheramie testified that what was shown on the diagram was consistent with what he observed about the cab and the information he received from Mr. Carson and | ^others about the cab, he later admitted that the diagram was not 100 percent accurate to his knowledge.
 

 The trial judge himself indicated at the hearing on the motion for sanctions that the diagram was ambiguous. Even defense counsel stated at another hearing that the diagram was ambiguous:
 

 The diagram itself cannot provide a substitution for the cab, because the diagram, without an author, is, on it’s [sic] face, somewhat ambiguous.
 

 We also find that the writing on the diagram constituted inadmissible hearsay because the defense wanted to use it to prove the truth of the matter asserted, i.e., that there were four bullet holes in the cab.
 
 [77]
 
 It is noted that defense counsel stated at the hearing on November 9, 2007 that the diagram would have shown that there were four bullet holes in the cab indicating that all five shots occurred inside the cab.
 
 [78]
 

 
 *320
 
 Further, it was uncontested at this trial that the victim was shot inside the cab, rather than outside, the theory advanced in the first trial. In fact, the prosecutor argued in his closing argument that the victim was shot inside the cab. Defense counsel also argued that this evidence showed there was a struggle for the gun inside the cab.
 

 Also, evidence other than the diagram showed the shooting took place inside the cab. Michael Grayson, the owner of the cab, testified that when he retrieved the cab from the Jefferson Parish Sheriffs Office five days after the victim was killed, he did not see any bullet holes on the outside of the cab or on the back seat. Mr. Carson, the crime scene technician, also testified that he did not see any bullet lachóles on the exterior of the cab. Additionally, a blood stain was found on the front seat of the cab, a jacket from a projectile was found on the rear floorboard, and broken glass and metal fragments were found inside the cab. The chain of custody form shows that a metal jacket to a bullet was found on the right rear floor of the cab, and pieces of metal were found on the right rear floor, next to the right rear door, inside the right rear “back of seat,” and inside the frame to the right center post.
 

 This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER FIVE
 
 — Refusal
 
 to allow introduction of alleged statement of party-opponent
 

 The trial court erred by refusing to allow Mr. Seals to introduce a statement of Ms party-opponent under Article 801(D)(2).
 

 In this assignment of error, defendant argues that the trial judge erred by refusing to allow him to introduce into evidence the prosecutor’s statement/stipulation that Mr. Thorne authored the diagram of the cab in this case. He contends that the prosecutor’s statement/stipulation was admissible as a material admission of a party opponent under LSA-C.E. art. 801(D)(2) and (D)(3).
 

 LSA-C.E. art. 801 provides in pertinent part:
 

 D. Statements which are not hearsay. A statement is not hearsay if:
 

 [[Image here]]
 

 (2) Personal, adoptive, and authorized admissions. The statement is offered against a party and is:
 

 (a) His own statement, in either his individual or a representative capacity;
 

 (b) A statement of which he has manifested his adoption or belief in its truth; or
 

 (c) A statement by a person authorized by him to make a statement concerning the subject.
 

 |as(3) Relational and privity admissions. The statement is offered against a party, and the statement is:
 

 (a) A statement by an agent or employee of the party against whom it is offered, concerning a matter within the scope of his agency or employment, made during the existence of the relationship[.]
 

 A stipulation has the effect of withdrawing a fact from issue and disposing with
 
 *321
 
 the need for proof of that fact.
 
 [79]
 
 “A stipulation has the effect of binding all parties and the court.... Such agreements are the law of the case.”
 
 [80]
 

 We find that the trial judge did not err by not allowing the prosecutor’s statement regarding the diagram into evidence. In this case, the record reflects that at a pretrial hearing in 2007, the prosecutor offered to stipulate that Mr. Thorne authored the diagram of the cab driven by the victim in this case. However, because defense counsel did not accept the stipulation, or even acknowledge it, there was no stipulation. Additionally, at the beginning of trial, the prosecutor advised the court that he was mistaken in his belief that Mr. Thorne had authored the diagram, and that after a lengthy investigation, he was unable to learn who did so. The prosecutor stated that Mr. Thorne’s testimony from the first trial, which he had not yet read at the time he offered the stipulation in 2007, revealed that Mr. Thorne made no diagram of the cab. As such, the prosecutor wanted the record to be clear that he now refused to stipulate that Mr. Thorne authored the diagram.
 

 The facts of this case are distinguishable from the ones in
 
 Freeland v. United States,
 

 [81]
 

 cited by defendant in the court below and on appeal. In that case, the appellate court held that the prior statements of an assistant U.S. attorney could be | ,¾, treated as party admissions. In that case, the statements were contained in a motion prepared, signed, and filed by the assistant U.S. attorney.
 
 [82]
 

 This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER SIX
 
 — Refusal
 
 to allow impeachment of an unavailable witness
 

 Mr. Seals was denied his right to confrontation by the trial court’s refusal to allow the defense to impeach an unavailable State witness under Article 806.
 

 Defendant next asserts that he was denied his right to confrontation by the trial judge’s refusal to allow him to impeach Jayce Burbank, the driver of the White Fleet cab who was driving defendant when he was stopped on the night of Mr. Feeney’s murder, and who was an unavailable State witness (due to his death between the times of the two trials), with a prior inconsistent statement under LSA-C.E. art. 806. The State responds that the purported impeachment statements are not contained in the record, and the statements were not proffered. The State asserts that because defendant did not make known the substance of his complaint, he cannot now rely upon it as a basis for relief. Nevertheless, the State maintains that any error in the admission of Mr. Burbank’s testimony was harmless considering the ample evidence to sustain the conviction.
 

 During the trial, the State stated its intent to introduce the prior trial testimo
 
 *322
 
 ny of deceased witness Jayee Burbank. Defense counsel responded that he wanted to enter a statement that Mr. Burbank made to the Jefferson Parish Sheriffs Office the night defendant was arrested on July 27,1991, in order to impeach him with it under LSA-C.E. art. 806. The trial judge denied defense | ^counsel’s motion to impeach Mr. Burbank with a prior statement. Later on, Mr. Burbank’s testimony from two prior proceedings was read to the jury.
 

 Mr. Burbank, the driver of the White Fleet cab, testified that on July 26, 1991, he was dispatched to Cindy Place where he picked up defendant who requested to be taken to Metairie, but then asked to be taken to Shrewsbury. Defendant sat in the front seat, and he had a bag that he kept against the door trying to keep Mr. Burbank from seeing it. At some point, the police pulled them over. Defendant hesitated and tried to put the bag under the seat, but it would not fit. When the officers shined a light inside the cab, Mr. Burbank saw bloody clothes and a hat on top of the clothes. Defendant said the clothes were his and that they got bloody during a fight. This testimony was corroborated by the testimony of Lt. Merida, who stopped the White Fleet cab.
 

 In this case, Mr. Burbank’s prior statement to the Jefferson Parish
 
 Sheriffs
 
 Office is not in the record, and defense counsel did not proffer it for this Court’s review. As such, it is impossible to determine whether that prior statement contained relevant inconsistent statements. Because defendant failed to proffer the substance of the excluded testimony, he is precluded from raising the issue on appeal.
 
 [83]
 

 This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER SEVEN
 
 — Denial
 
 of right to recross-examination of witnesses
 

 The trial court erred by refusing to allow Mr. Seals to recross-examine witnesses when new matters were brought up on redirect.
 

 Defendant argues here that the trial judge erred by prohibiting him from recross-examination where the State introduced new matters on redirect. He 14i contends that the trial judge’s error was part of a series of erroneous rulings throughout trial that severely curtailed his right to present a defense. The State responds that the rulings of the trial judge did not constitute an abuse of discretion.
 

 A witness who has been cross-examined is subject to redirect examination as to matters covered on cross-examination, and in the discretion of the court, as to other matters in the case.
 
 [84]
 
 When the court has allowed a party to bring out a new matter on redirect, the other parties shall be provided an opportunity to recross on such matters.
 
 [85]
 
 Generally, the matter of permitting recross-examination is in the sound discretion of the trial judge and in the absence of some showing of an abuse of that discretion, and resulting prejudice, his ruling will not be disturbed on appeal.
 
 [86]
 

 Defendant contends that the trial court denied his requests to recross-examine certain witnesses.
 
 [87]
 
 He focuses his argu
 
 *323
 
 ment on witnesses Eddie Lecourt, Reed Cheramie, and John Lewoczko as being among the most prejudicial denials of recross-examination. Defendant also argues that prejudicial denials of recross-examination occurred during the testimony of Michael Grayson, Fraser MacKenzie, and Joseph Picone.
 

 Eddie Lecourt
 

 On cross-examination, defense counsel elicited testimony regarding how each cab driver made different amounts of money, and that it was not possible to tell how much someone made on a particular shift because every day was different. During redirect, the prosecutor asked Mr. Lecourt whether all days were the same or whether some were better than others, like Fridays. Defense counsel objected, |4?but the trial judge overruled the objection after the prosecutor explained that defense counsel had asked a general question about the difference in fares. The prosecutor then asked Mr. Lecourt whether the victim was a lax kind of worker or a hard worker. Defense counsel objected that it was beyond the scope and went to his character, but the trial judge overruled the objection after the prosecutor argued that the cross-examination covered how much money the victim might have made on the day he was killed.
 

 After the redirect examination, defense counsel was allowed re-cross on only one matter, “10-4,” but was denied recross on the matters noted above. We find that the trial court did not abuse his discretion in denying the defense’s recross of this witness. The redirect questions did not involve a new matter and were only an extension of previous testimony elicited during cross-examination regarding how much money the victim might have made on the day of his death.
 

 Beed Cheramie
 

 During cross-examination, defense counsel asked Detective Cheramie questions regarding whether the diagram was consistent with the state of the cab and questions regarding the plastic bag shown in a photograph with the gun. On redirect, the prosecutor asked questions as to why the plastic bag would be present and whether the diagram was 100 percent accurate. Defense counsel objected to the questions regarding the diagram, which the trial judge overruled. Defense counsel later asked permission to recross as to the plastic bag, but the trial judge refused, noting that defense counsel brought up the plastic bag.
 

 The redirect questions did not involve a new matter and were only an extension of previous testimony regarding the plastic bag and the diagram elicited during cross-examination. Therefore, we find that the trial judge did not abuse his discretion in refusing to permit recross-examination of Detective Cheramie.
 

 |
 
 qjfohti Lewoczko
 

 Defense counsel elicited testimony during cross-examination of Mr. Lewoczko regarding lead residue and the factors that might affect gunshot residue. Mr. Lewoc-zko testified that not all gunshot residues that created a pattern could be easily removed. He explained that residues varied from case to case, but the more difficult ones to remove would be lead residues. On redirect, Mr. Lewoczko testified that loose particles could be removed, but not the lead residue that gets into the fibers of the fabric. Defense counsel objected, arguing that the witness had previously said it was on a case-by-case basis. The trial judge overruled the objection. Defense counsel asked to briefly recross, but the trial judge denied that request.
 

 
 *324
 
 The redirect questions did not involve a new matter and were only an extension of previous testimony regarding lead residue and the removal of gunshot residue elicited during cross-examination. Additionally, the witness’ testimony was not dramatically different on cross-examination and redirect examination. We find no abuse of discretion in refusing to permit recross-examination of Mr. Lewoczko.
 

 Michael Grayson
 

 During cross-examination, defense counsel showed Mr. Grayson a photograph that he identified as the interior of a cab. Defense counsel said, “It’s another photograph of the interior of the cab that the State didn’t provide to you?” Mr. Grayson again said that it showed the interior of his cab. On redirect, the prosecutor verified that he showed Mr. Grayson three photographs of the cab that day, but that he had showed Mr. Grayson at his home the first time they met photographs of the back seat, the front seat, the floor, and the inside of the cab. The prosecutor said, “So that’s not the first time—it’s not entirely true when Ms. |4<tConner said to you that I’ve never shown you this picture—or I chose not to show you this picture. Correct?” Mr. Grayson responded, “No. You showed me this picture.” Defense counsel objected to leading and to mischaraeterization, but the trial judge apparently overruled the objection. Defense counsel asked for permission to recross, but the trial judge denied that request.
 

 The record shows that the prosecutor did not raise any new issues on redirect, and that his questions were only an extension of previous testimony elicited during cross-examination regarding the photographs the State had shown the witness. It appears that the State was trying to correct the impression left by defense counsel during cross-examination that the State had not shown certain photographs to Mr. Grayson. Accordingly, there was no abuse of discretion in denying recross of Mr. Grayson.
 

 Fraser MacKenzie
 

 During cross-examination, Dr. MacKenzie testified in response to defense counsel’s questioning of what could be considered “intervening objects” that could disrupt a gunshot residue pattern. He also testified that intervening objects could prevent him from concluding whether a particular wound was inflicted at a distance of greater than or less than two feet. Dr. MacKenzie also asserted during cross-examination that intervening materials could cause the prevention of gunshot residue being in a wound that was within eighteen to twenty-four inches from the firing gun. On redirect examination, the prosecutor asked Dr. MacKenzie whether gloves could be considered intervening objects and what he would have expected to find had the victim worn gloves. Defense counsel asked permission to recross regarding gloves and the manner of death; however, the trial judge ruled that defense counsel could only recross on the area he thought was new—the manner of death.
 

 LfiThe record shows that the prosecutor did not raise any new issues on redirect, and that his questions were only an extension of previous testimony elicited during cross-examination regarding intervening objects. Therefore, the trial judge did not abuse his discretion in refusing to permit recross-examination of Dr. MacKenzie.
 

 Lieutenant Joseph Picone
 

 During cross-examination, defense counsel asked Lt. Picone whether he conducted a gunshot residue test on the victim’s hands, to which he replied, “no.” Defense counsel then asked, “You never requested the test that would have told you whether or not his hands were in the vicinity of gun [sic] being shot?” Lt. Pi-cone replied that he already knew the
 
 *325
 
 victim was in the vicinity of a gun being shot because each of his hands sustained a bullet wound. During redirect examination, the prosecutor asked Lt. Picone how he could tell the victim was in the vicinity of a gun being shot, to which Lt. Picone responded that he could see stippling, powder burns, in the facial area.
 

 Defense counsel objected, arguing that the witness was not an expert, but the trial judge overruled the objection. The prosecutor then asked a series of questions regarding his experience in law enforcement and in viewing stippling. When the prosecutor asked Lt. Picone, “You wouldn’t make a mistake, would you?”, defense counsel objected to leading, and the trial judge sustained the objection. Defense counsel asked to recross the witness, but the trial judge refused that request.
 

 The record shows that the prosecutor did not raise any new issues on redirect, and that his questions were only an extension of previous testimony elicited during cross-examination regarding the determination of whether the victim was in the vicinity of a gun being shot. We find that the trial judge did not abuse his discretion in refusing to permit recross-examination of Lt. Picone.
 

 | ^Additionally, it is noted that defendant could have recalled all of the witnesses in question to the stand as part of his case if he had thought certain areas of testimony needed to be addressed, but he did not do so.
 

 This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER NINE
 
 — Improper
 
 introduction of hearsay evidence (as a preface to Assignments of Error Nos. Ten, Eleven, Twelve, and Thirteen)
 

 The trial court’s repeated admission of out-of-court hearsay testimony, which the defense had no similar opportunity and motive to cross-examine, violated the Sixth and Fourteenth Amendments.
 

 As a preface to Assignments of Error Nos. Ten
 
 (improper admission of hearsay evidence to prove robbery),
 
 Eleven
 
 (improper introduction of hearsay
 
 evidence—
 
 statements of victim immediately prior to death),
 
 Twelve
 
 (improper admission of hearsay evidence
 
 — testimony
 
 of “unreliable”
 
 witness), and Thirteen
 
 (improper introduction of evidence of victim’s “good character”),
 
 fully set forth and analyzed below, defendant argues that individual and cumulative effects of hearsay evidence introduced by the State at trial violated the Confrontation Clause and Louisiana evidence law.
 

 ASSIGNMENT OF ERROR NUMBER TEN
 
 — Improper
 
 admission of hearsay evidence to prove robbery
 

 The State violated the Confrontation Clause and due process by its elicitation of hearsay testimony to prove robbery.
 

 Here, defendant argues that the trial judge erred by allowing the State to elicit hearsay testimony from Margaret Feeney, the victim’s wife, regarding the amount of money the victim had in his possession on the night he was killed. The State responds that defendant is not entitled to relief because he himself elicited the substance of the statements made by the victim to Mrs. Feeney. Alternatively, the |47State responds that any error was harmless because the testimony in question was cumulative or corroborative of other testimony adduced at trial that showed the victim was robbed.
 

 Hearsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial, offered in evidence to prove the truth of the matter asserted.
 
 [88]
 
 Hearsay evidence is not admissible except as other
 
 *326
 
 wise specified in the Code of Evidence or other legislation.
 
 [89]
 
 Hearsay is excluded because the value of the statement rests on the credibility of the out-of-court as-serter, who is not subject to cross-examination and other safeguards of reliability.
 
 [90]
 
 Although a statement may constitute inadmissible hearsay, if the statement is merely cumulative or corroborative of other evidence, the admission of the evidence is harmless error.
 
 [91]
 

 During the direct examination of Mrs. Feeney, the prosecutor asked her whether she knew if the victim had money on him when he came back to the house on the night in question. Defense counsel objected, and Mrs. Feeney replied affirmatively. The trial judge overruled the objection. The prosecutor then asked Mrs. Feeney if she knew whether the victim had yet paid the rent for the cab that Friday. Defense counsel objected again, and Mrs. Feeney replied that she did not know. The trial judge said, “It’s irrelevant.”
 

 During cross-examination, defense counsel elicited testimony from Mrs. Feeney about the substance of the statements the victim made to her regarding whether the victim was going to pay Mr. Grayson the rent on the cab the following |4Sday. Defense counsel also asked Mrs. Feeney whether she actually saw the money the victim claimed he had that night, and Mrs. Feeney responded negatively.
 

 Mrs. Feeney’s response on direct examination that she was aware the victim had money on him that night was hearsay because it was offered to prove the truth of the matter asserted, i.e., that the victim had money on him that night. Ostensibly, the basis of her knowledge was her husband’s representations to her. Nevertheless, the admission of the statement was harmless error because Mrs. Feeney’s testimony was cumulative or corroborative of other evidence.
 

 As was discussed in depth under Assignment of Error Number Eight regarding the sufficiency of the State’s evidence, other evidence was admitted at trial that shows the victim was robbed. Mr. Belile testified that the victim, while dying, told him he had been robbed. Defendant admitted in his statement that he took the victim’s cab and gun and left the victim on the side of the road. The keys to the victim’s cab were found in defendant’s pocket when he was arrested. Mr. Lec-ourt, the dispatcher, testified that the victim had twelve fares that day, excluding walk-up passengers, and that in 1991, each fare would have averaged approximately seven or eight dollars. He also testified that cab drivers usually started out with twenty to forty dollars in order to make change.
 

 Additionally, the victim only had a one-dollar bill and a two-dollar bill in his wallet when he was found, whereas defendant had approximately sixty dollars in small-bill currency covered in a blood-like substance in his possession. The Louisiana Supreme Court in defendant’s first appeal found that the denominations of the money depicted in three photographic exhibits showing the bloodied bills | ^constituted graphic evidence which the jury could have considered proof that defendant acquired this money by robbing the cab driver he
 
 *327
 
 admitted he shot.
 
 [92]
 

 Defendant also argues that he did not have a meaningful opportunity and similar motive to cross-examine the prior testimony of Jayce Burbank and Curtis Thorne; thus, the admission of this hearsay testimony violated the Confrontation Clause. He claims specifically that the trial judge erred by admitting into evidence the testimonies of deceased witnesses Jayce Burbank and Curtis Thorne from his first trial and Mr. Burbank’s testimony from a pretrial hearing before the first trial. He contends that this testimony should have been excluded because: 1) he received ineffective assistance of counsel at the prior proceedings in that counsel failed to conduct pretrial investigation, trial preparation, and probative cross-examination; 2) trial counsel did not have a similar opportunity or motive to cross-examine Mr. Burbank because a prior statement that would have impeached Mr. Burbank’s credibility was withheld from the defense at the time of trial; 3) the prosecution withheld from defense counsel a crime scene diagram showing four bullet holes in the cab, and defense counsel did not have a similar opportunity or motive to cross-examine Mr. Thorne about this diagram; 4) the Louisiana Supreme Court reversed defendant’s prior conviction because the trial judge failed to hold a competency hearing; and 5) Mr. Burbank’s testimony contained inadmissible hearsay statements.
 

 On February 26, 2009, the State filed a pleading entitled “State’s Motion to Admit Prior Witness Testimony at Trial.” Defendant opposed the motion on substantially the same grounds asserted here on appeal. The trial court granted the State’s motion. Defendant took writs to this Court, which were denied, this Court | ¡^finding no error in the trial court’s ruling on the basis of LSA-C.E. art. 804(A)(4) and (B)(1).
 
 [93]
 

 In this case, defendant has not shown that this Court’s prior denial of his writ application regarding the State’s motion was patently erroneous and produced unjust results. Moreover, defendant has produced no new evidence to support this Court’s reconsideration of the issue.
 
 [94]
 
 Accordingly, we find no error in the ruling.
 

 However, even if we were to find that this Court’s prior denial of defendant’s writ application on this issue should be reconsidered, as shown below, defendant is not entitled to relief on this issue.
 

 LSA-C.E. art. 804 provides in pertinent part:
 

 B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
 

 (1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a party with a similar interest, had an opportunity and similar
 
 *328
 
 motive to develop the testimony by direct, cross, or redirect examination[.]
 

 In order to avoid offending the confrontation and cross-examination clauses of the federal and state constitutions when using prior testimony at a subsequent trial, the following conditions must be met: 1) defendant must have been represented by counsel at the earlier hearing; 2) the witness testified under oath; 3) the witness was cross-examined or else there was a valid waiver of the right to cross-examination; 4) at the time of the trial, the witness is unavailable or unable to testify; and 5) the State has made a good faith diligent effort to obtain the presence |C[of the witness, including by its out-of-state subpoena powers where appropriate.
 
 [95]
 
 In this case, all of the relevant conditions have been met, i.e., defendant was represented by counsel at the earlier trial and hearing, the witnesses testified under oath, the witnesses were examined by defense counsel either during direct or cross-examination, and at the time of the second trial, the witnesses were deceased.
 

 Nevertheless, defendant makes five arguments on appeal as to why the trial judge erred by admitting the prior testimony of Mr. Burbank and Mr. Thorne.
 

 Ineffective assistance of counsel
 

 Defendant argues that the prior testimony was inadmissible because he received ineffective assistance of counsel at the prior proceedings in that counsel failed to conduct pretrial investigation, trial preparation, and probative cross-examination.
 

 A criminal defendant is entitled to effective assistance of counsel under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution. To prove ineffective assistance of counsel, a defendant must show both that: 1) his attorney’s performance was deficient; and 2) the deficiency prejudiced him.
 
 [96]
 
 An error is considered prejudicial if it was so serious as to deprive the defendant of a fair trial, or “a trial whose result is reliable.”
 
 [97]
 
 To prove prejudice, the defendant must demonstrate that, but for counsel’s unprofessional conduct, the outcome of the trial would have been different.
 
 [98]
 

 Generally, an ineffective assistance of counsel claim is best addressed through an application for post-conviction relief filed in the trial court where a full evidentiary hearing can be conducted. However, when the record contains Insufficient evidence to rule on the merits of the claim and the issue is properly raised by an assignment of error on appeal, it may be addressed in the interest of judicial economy.
 
 [99]
 

 In this case, the actions described by defendant in brief regarding his prior counsel fall within the ambit of trial strategy. Further, defendant’s allegations are conclusory and lacking detail; he does not state with any specificity what previous
 
 *329
 
 counsel should have done differently. We find that defendant has not demonstrated that, but for counsel’s alleged unprofessional conduct, the outcome of the trial would have been different.
 

 Prior testimony of Mr. Burbank
 

 Defendant argues that Mr. Burbank’s prior testimony was inadmissible because trial counsel did not have a similar opportunity or motive to cross-examine Mr. Burbank since a prior statement that would have impeached Mr. Burbank’s credibility was withheld from the defense at the time of trial. As was discussed under Assignment of Error Number Six, Mr. Burbank’s prior statement is not in the record, and defense counsel in this trial did not proffer it for this Court’s review. As such, it is impossible to determine whether that prior statement contained relevant inconsistent statements. Therefore, defendant is precluded from raising this issue on appeal.
 
 [100]
 

 Prior testimony of Mr. Thorne
 

 Defendant argues that Mr. Thorne’s prior testimony was inadmissible because the prosecution withheld from defense counsel a crime scene diagram showing four bullet holes in a cab, allegedly authored by Mr. Thorne, and that defense counsel at the first trial did not have a similar opportunity or motive to cross-examine Mr. Thorne about this diagram. As was discussed under | ¡^Assignment of Error Number Four, although Mr. Thorne was not questioned specifically about the diagram, he did testify that he was not involved in either searching or looking into either the Metry cab or the White Fleet cab. Further, Mr. Thorne could not have provided relevant testimony regarding the diagram because his prior testimony indicates that he did not draw the diagram. As was discussed previously, the diagram was ambiguous because it was unclear whether the bullet holes were made from the outside in or from the inside out; none of the witnesses testified that the diagram was an accurate representation of the subject matter in question; and it was uneon-tested at trial that the victim was shot inside the cab.
 

 Defendant’s competency
 

 Defendant argues that the prior testimony of Mr. Burbank and Mr. Thorne was inadmissible because the Supreme Court vacated the entire first trial proceedings after determining that defendant was “legally incompetent to stand trial.”
 

 Contrary to defendant’s assertion, defendant was never found incompetent to stand trial in the previous proceedings. In post-conviction proceedings following the Supreme Court’s affirmance of defendant’s conviction and sentence, defendant asserted a due process violation for the trial court’s failure to conduct a competency examination after it was ordered by the trial court prior to the first trial. The district court subsequently conducted hearings to determine if a meaningful retrospective
 
 {nunc pro tunc)
 
 evaluation of defendant’s competency could be made. After finding the record inadequate to make such a determination, the district court then granted post-conviction relief, vacated the conviction and | ¡-^sentence, and ordered a new trial. The Supreme Court affirmed, agreeing that the record was inadequate to allow a retroactive competency hearing.
 
 [101]
 

 Defendant cites no jurisprudence or other support for his position that the prior testimony of Mr. Burbank and Mr. Thorne
 
 *330
 
 should be excluded under these circumstances. As was stated previously, defendant was represented by counsel at the earlier trial and hearing, the witnesses testified under oath, the witnesses were examined by defense counsel either during direct or cross-examination, and at the time of the second trial, the witnesses were deceased. As such, we find, as this Court previously has,
 
 [102]
 
 that the testimony was properly admissible as an exception to the hearsay rule under LSA-C.E. art. 804(A)(4) and (B)(1).
 

 Hearsay testimony of Mr. Burbank
 

 Defendant also argues that Mr. Burbank’s prior testimony was inadmissible because it contained hearsay statements. He raised this issue, in part, prior to the testimony being read. Mr. Burbank testified at a hearing prior to the first trial and at the first trial regarding the circumstances surrounding the stop of the White Fleet cab he drove and in which defendant was a passenger. That testimony contained references to what he, the officer, and defendant did and said. A review of the prior testimony shows that no hearsay objections were made at the first trial during Mr. Burbank’s testimony. At the second trial, a hearsay objection was made to part of his testimony and specific portions of the testimony were stricken before the testimony was read.
 

 Even if the trial judge erred by admitting portions of the prior testimony of Mr. Burbank and Mr. Thorne, any error was harmless. Much of the testimony of Mr. Burbank was cumulative and corroborative of Lt. Merida’s testimony regarding the stop of the White Fleet cab and defendant’s own statements to the [¡¡¡¡police. It is noted that defendant said in his statements to the police the same thing he said in front of Mr. Burbank, namely, that the bloody clothing was his and that it became bloody during a fight. Mr. Thorne, a crime scene technician, testified briefly that he collected some evidence at the Earhart scene. The testimony of Mr. Burbank and Mr. Thorne was not central to the State’s case. Considering the overwhelming evidence against defendant as was discussed under Assignment of Error Number Eight, the verdict was surely unattributable to any error in the admission of the prior testimony of Mr. Burbank and Mr. Thorne.
 

 We find no merit to this assignment of error.
 

 ASSIGNMENT OF ERROR NUMBER ELEVEN
 
 — Improper
 
 introduction of hearsay evidence
 
 — statements
 
 of victim immediately prior to death
 

 The admission of the testimonial statement of Raymond Feeney violated the Confrontation Clause and due process.
 

 Here, defendant argues that the testimonial statement of Mr. Feeney allegedly stating that he had been robbed violated the Confrontation Clause. Specifically, defendant argues that the trial judge erred by admitting Mr. Feeney’s statements into evidence through Mr. Belile’s testimony. He contends that admission of Mr. Fee-ney’s statements violated the
 
 Crawford
 
 rule because the statements were testimonial, and he had no opportunity to cross-examine Mr. Feeney.
 
 [103]
 
 Defendant asserts that Mr. Feeney’s statements were not a dying declaration since there was no showing that Mr. Feeney knew his death was imminent. He further asserts that even if Mr. Feeney believed his death was imminent, most of his statements did not concern the cause or circumstances of his death.
 

 
 *331
 
 IsfiThe State responds that Mr. Feeney’s statements were admissible as a dying declaration, which is an exception to the hearsay rule, and that
 
 Crawford
 
 does not bar admission of dying declarations. The State asserts that the evidence showed Mr. Feeney believed he was dying, and that his statements qualified as a dying declaration. Alternatively, the State argues that any error in the admission of Mr. Feeney’s statements was harmless because there was sufficient other evidence that defendant robbed Mr. Feeney.
 

 On December 7, 2006, defendant filed a “Motion to Exclude the Introduction of Inadmissible Hearsay Statements Allegedly Made by the Decedent and to Preclude the Introduction of Inadmissible Hearsay and Other Evidence Upon Which the State has the Burden of Establishing a Condition Precedent.” In that motion, defendant made the same arguments he makes on appeal. At the hearing on February 8, 2007, the trial judge heard arguments of counsel and then denied the motion. Defense counsel noted her objection and intention to take writs. Defendant subsequently filed a writ application with this Court. This Court granted the writ, finding that the trial court erred by denying the Motion to Preclude Hearsay Statements without allowing defendant an evi-dentiary hearing. This Court also stated:
 

 Defendant further argues that the trial court erred in denying his Motion to Preclude Hearsay Statements because there has been a change in the law of hearsay statements since this matter was decided in defendant’s first trial. Defendant contends
 
 Crawford v. Washington,
 
 541 U.S. 36, 124 S.Ct. 1854, 158 L.Ed.2d 177 (2004) holds that an out of court testimonial statement of an absent witness is admissible only if the defendant had a prior opportunity to cross-examine the witness. However, the
 
 Crawford
 
 court specifically excluded dying declarations. Thus, if the statements made by the victim to Mr. Belile are determined to be dying declarations,
 
 Crawford
 
 does not bar their admission.
 

 | B7For the foregoing reasons, the ruling denying defendant’ [sic] Motion to Preclude Hearsay Statements is set aside and the trial court is instructed to hold a hearing on the admissibility of this testimony.
 
 [104]
 

 Exceptions to the hearsay rule include dying declarations.
 
 [105]
 
 A dying declaration is defined as “[a] statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.” A statement is admissible as a dying declaration if it is made when the declarant is conscious of his condition and aware of his approaching demise.
 
 [106]
 
 The victim need not express his awareness of his demise in direct terms, but rather the necessary state of mind may be inferred from the facts and circumstances surrounding the making of the declaration.
 
 [107]
 

 A trial judge’s determination of the admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion.
 
 [108]
 

 
 *332
 
 We find that the victim’s statements to Mr. Belile were clearly a dying declaration. The victim sustained five gunshot wounds, two of which went through his chest, his lungs and stomach, and out his back. The record indicates the victim died of his gunshot wounds shortly after making his statements. Also, the victim’s statements show that the victim believed his death was imminent, as evidenced by his statement, “Help, me, please. I’m dying. I’m messed up,” and by his praying.
 
 [109]
 

 As was stated previously, this Court, in its granting of defendant’s writ, has already found that
 
 Crawford
 
 specifically excluded dying declarations, and therefore, if the statements made by the victim to Mr. Belile were determined to be |fiSdying declarations,
 
 Crawford
 
 did not bar their admission. We find that
 
 Crawford
 
 does not bar their admission, and therefore, the trial judge did not err by granting the State’s motion to admit the victim’s dying declaration. Additionally, it is noted that defense counsel himself said during Mr. Belile’s testimony at trial, “I absolutely agree he can talk about what Mr. Feeney said.”
 

 This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER TWELVE—Improper admission of hearsay evidence—testimony of “unreliable” witness
 

 The trial court erred by allowing the State to bolster the testimony of its unreliable witnesses by the use of hearsay testimony, in violation of the Due Process Clause and Mr. Seals’ right to a fair trial.
 

 In this assignment, defendant argues that Mr. Belile’s testimony was riddled with impermissible and prejudicial hearsay, and specifically, that the trial judge erred by allowing the State to elicit hearsay from Mr. Belile as to statements he made to the police regarding what Mr. Feeney had told him. He also contends that Mr. Belile’s prior consistent statements were inadmissible because there was no charge of recent fabrication to rebut. He asserts that any error was not harmless considering the State’s case hinged strongly on Mr. Belile’s testimony.
 

 Defendant did not make a contemporaneous objection to the first set of contested testimony, and, as shown below, did not state the grounds for his objection as to the second portion. Therefore, defendant has not preserved this claim for appeal.
 

 During Mr. Belile’s testimony, the prosecutor asked Mr. Belile whether he met with anyone other than the prosecution to tell them what he told the jury. Mr. Belile answered affirmatively. Defense counsel objected, which the trial judge sustained. When the prosecutor asked Mr. Belile whether he told them the same | nothing he told the jury, defense counsel objected again, but the trial judge overruled the objection and said the witness could answer that question. Mr. Belile then answered affirmatively.
 

 Defense counsel did not specify the grounds for his objection. To preserve the right to appellate review of an alleged trial court error, a party must state a contemporaneous objection with the occurrence of the alleged error as well as the grounds for the objection.
 
 [110]
 
 Because de
 
 *333
 
 fense counsel failed to specify the grounds for his objection, defendant has not preserved this issue for review on appeal.
 

 Defendant also argues that the cumulative effect of hearsay evidence caused prejudice at trial. The combined effect of assignments of error, none of which warrant reversal on its own, does not deprive a defendant of his right to a constitutionally fair trial.
 
 [111]
 

 This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER THIRTEEN
 
 — Improper
 
 introduction of evidence of victim’s “good character”
 

 The trial court erred by allowing the State to present inadmissible evidence of the victim’s “good character” in its case-in-chief, in violation of the Due Process Clause and Mr. Seals’ right to a fair trial.
 

 Next defendant argues that the trial judge erred by allowing the State to present inadmissible evidence of the victim’s “good character” in its case-in-chief, contrary to LSA-C.E. art. 404(A)(2). He objects to statements made by the prosecutor in his opening statement and to testimony elicited from Margaret Feeney, Eddie Lecourt, and Michael Grayson. The State responds that brief references to the nature and background of the victim do not affect the substantial | frights of defendant. Alternatively, the State contends that any error was harmless considering the overwhelming evidence of defendant’s guilt presented at trial.
 

 LSA-C.E. art. 404 provides in pertinent part:
 

 A. Character evidence generally. Evidence of a person’s character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
 

 * * *
 

 (2) Character of victim.
 

 (a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible; ... or
 

 (b) Evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor[.]
 

 Prior to trial, the trial judge said that a human being was allowed to be made into a human being in front of the jury, but that he did not want it to go too far. He said that the prosecutor could elicit certain background information on the victim. The trial judge overruled the defense request to bar the background information of the victim, and defense counsel noted his objection. The trial judge said that if something went too far, he would make a decision at that time.
 

 In his opening statement, the prosecutor said that the victim’s wife would testify that the victim was a good father, a good provider, and a good husband. He also stated that this case was about givers and takers, and that the victim was a giver.
 
 *334
 
 The prosecutor also provided some general background information on the victim. Defense counsel did not object to these statements at that time.
 

 | fi1 During the direct examination of Margaret Feeney, the victim’s wife, the prosecutor asked what kind of person the victim was. Mrs. Feeney replied that he was the kindest person she had ever known, that he treated strangers and family alike, and that he helped anyone who needed it. Defense counsel objected. The trial judge did not explicitly rule on the objection, but it appears that he may have tacitly sustained it when he interrupted the witness’ answer by saying, “All right,” and “Okay,” and the prosecutor moved on to another topic.
 

 Both Eddie Lecourt and Michael Gray-son testified generally that the victim was a hard worker and was reliable. Defense counsel objected when the prosecutor stated that as dispatcher and manager, Mr. Lecourt would have been familiar with any complaints about the victim, but the objection was overruled.
 

 In
 
 State v. Taylor,
 

 [112]
 

 the defendant contended the State went beyond the proper scope of examination by eliciting testimony about the victim’s good character through its direct examination of the victim’s coworker. When the State asked the coworker to describe the victim, he testified without objection that the victim was an extremely affable, generous, sweet man, that he was easy to work with, an asset to the dealership, that he fit in well with everyone, and that he was a nice family man. The Supreme Court found that even assuming the State’s opening statement and the testimony from the co-worker were irrelevant, the evidence was hardly prejudicial, considering it merely humanized the deceased victim and did not overly detail the victim’s good qualities.
 
 [113]
 

 Even assuming that the State’s opening statement and the testimony from Mrs. Feeney, Mr. Lecourt, and Mr. Gray-son were irrelevant, we find that the evidence was not prejudicial, considering it merely humanized the deceased victim | fi2and did not overly detail the victim’s good qualities. Additionally, with respect to Mr. Lecourt, the prosecutor apparently asked him whether he was aware of any complaints about the victim’s demeanor in order to counter defendant’s contention that the victim pulled his gun out and pointed it at defendant for no good reason. Also, it appears that the prosecutor asked Mr. Lecourt on redirect if the victim was a good worker in order to respond to defense counsel’s cross-examination where the defense suggested that the victim may not have made much money by the end of his shift. As such, we decline to find that the prosecutor’s questioning of Mr. Lec-ourt was improper.
 

 As to Mr. Grayson, defendant did not object to the prosecutor’s question regarding what kind of driver the victim was, or to the witness’ answer. Therefore, defendant failed to preserve the issue regarding Mr. Grayson for review.
 
 [114]
 

 Lastly, it is noted that at the conclusion of trial, the trial judge charged the jurors that they were not to be influenced by sympathy, passion, or prejudice.
 

 
 *335
 
 This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER FOURTEEN
 
 — Improper
 
 disposing of evidence
 

 The State violated due process by improperly disposing of evidence before the defense could examine it and then making affirmative use of it in its case in chief.
 

 Defendant next argues that the loss or destruction of critical evidence at the hands of the State deprived him of due process and made his trial fundamentally unfair. Specifically, he contends that the State violated its duty to preserve the cab, the victim’s trip log, the bloody money, and the victim’s wallet. Defendant asserts that this evidence was highly relevant to prove robbery and motive and would have | («been expected to play a significant role in the defense. He maintains that this case should not be examined under the bad faith test set forth in
 
 Arizona v. Young-
 
 bloodl
 
 [115]
 
 Nevertheless, defendant claims there exists sufficient bad faith to warrant reversal.
 

 The State responds that Louisiana has adopted the holding of
 
 Youngblood
 
 and places the burden on defendant to demonstrate bad faith on the part of the State relative to the failure to preserve potentially useful evidence. The State further responds that defendant has produced no evidence to show that the State acted in bad faith with regard to the items at issue, nor has he shown that the items had apparent exculpatory value.
 

 Due process requires that the State provide a defendant with any exculpatory evidence in its possession that is material to defendant’s guilt or punishment, regardless of the good faith or bad faith of the prosecutor.
 
 [116]
 
 Where a defendant claims that his due process rights have been violated due to the State’s failure to preserve potentially useful evidence, the defendant has the burden of showing that the State acted in bad faith.
 
 [117]
 
 In
 
 California v.
 
 Trombetta,
 
 [118]
 
 the United States Supreme Court explained:
 

 Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect’s defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.
 

 In this case, on December 7, 2006, defendant filed a “Motion for Sanctions in Light of the State’s Failure to Preserve Crucial Evidence” and a “Motion for | ^Suppression and for a Jury Instruction Based on the State’s Failure to Preserve Crucial Evidence.” On November 9, 2007, after hearing arguments of counsel and considering the parties’ memoranda, the trial judge denied the motions.
 

 Cab
 

 Defendant has failed to show that the State acted in bad faith in failing to preserve the cab. Michael Grayson, the
 
 *336
 
 owner of the cab, testified that he contacted the Jefferson Parish Sheriffs Office numerous times after the incident to retrieve the cab. He explained that he was not a cold-hearted person, but that he wanted to retrieve the cab in order to put it back into service. Mr. Grayson further explained that he was paying approximately $100.00 per week in dues on the cab to Metry Cab. On July 31, 1991, approximately five days after the incident, Mr. Grayson signed a property release and retrieved the cab.
 

 Given that in this trial, it was uncontested that the shooting occurred inside the cab, it does not appear that the cab possessed an exculpatory value before it was returned to Mr. Grayson. Defendant contends that the cab had the potential to show that all of the shots were fired from the interior, which would have proven he shot the victim in self-defense during a struggle over the gun. As was discussed in depth previously, there was other evidence that showed the shooting took place inside the cab, including metal fragments, a jacket from a projectile, broken glass, and a blood stain having been found inside the cab. Further, Mr. Grayson testified that when he retrieved the cab, he did not see any bullet holes on the outside of the cab. If there had been any, he would have had to fix them prior to returning the cab to service. Mr. Carson, the crime scene technician, also did not see any bullet holes on the exterior of the cab.
 

 The State did not dispute that the shooting took place inside the cab, and in fact, argued to the jury that the victim was shot inside the cab. Finally, comparable Issevidence was available because Mr. Carson took photographs of the interior of the cab that were admitted into evidence at trial.
 

 Trip Log
 

 Defendant contends that the State failed to preserve the notebook in which the victim recorded all of his trips and the fares received. He further contends that the trip log would have shown how much money the victim had on hand at the time defendant entered the cab. However, there is no evidence that the victim kept such a log, or that the State ever possessed it if he did. Accordingly, defendant has failed to show any error in this regard.
 
 [119]
 

 In any event, comparable evidence was available because Eddie Lecourt, the cab company’s dispatcher, testified that the company’s daily logbook reflected the victim had twelve fares on the day of his death. As such, the trip log for that date may have provided additional inculpatory rather than exculpatory evidence, in that it may have shown any walk-up fares the victim had that day or night, thereby providing evidence that the victim may have earned even more money than was reflected in the cab company’s logbook.
 

 Bloody Money
 

 It is unclear how the loss of the bloody money affected defendant since that evidence was inculpatory in nature. Nevertheless, we find that defendant has not shown that the State acted in bad faith in losing, destroying, or failing to preserve the bloody money. Milton Dureau, Jr., the director of the crime lab, testified that he had conducted an extensive search, but could not find the money. This, alone, does not show bad faith on the part of the State. Further, comparable evidence was available in that photographs of the bloody
 
 *337
 
 money found on defendant were | ^admitted into evidence at trial. Also, two ten-dollar bills and two twenty-dollar bills with blood on them were found on the seat of the White Fleet cab and admitted into evidence at trial.
 

 Wallet
 

 Defendant contends that the State disposed of Mr. Feeney’s wallet before it could be tested for fingerprints. However, the record fails to show that the State acted in bad faith in failing to preserve the wallet. It does not appear that the wallet possessed an apparent exculpatory value before it was returned to Mrs. Feeney, since the State never maintained that defendant went into the victim’s wallet or robbed the victim of the contents of his wallet.
 
 [120]
 

 This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER FIFTEEN
 
 — Refusal
 
 to give requested spoliation instruction to the jury
 

 The trial court abused its discretion by refusing to give the requested spoliation instruction to the jury, in violation of Mr. Seals’ right to put on a defense.
 

 Defendant argues in this assignment that the trial judge abused his discretion by refusing to give the requested spoliation instruction to the jury. The State responds that the trial judge properly denied the request to charge the jury with the proposed instruction, as it was not wholly correct and would have required explanation.
 

 Defendant requested the following special jury instruction:
 

 If evidence material to an issue in this case was peculiarly within the power of one party to produce, was not produced by that party, and its absence has not been sufficiently accounted for or explained, then you may, if you deem it appropriate, infer that the ^evidence would have been unfavorable to the party which failed to produce it.
 

 Failure to read a special jury charge constitutes reversible error only when there is prejudice to the substantial rights of the defendant or the violation of some constitutional or statutory right.
 
 [121]
 

 LSA-C.Cr.P. art. 807 provides, in pertinent part:
 

 A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
 

 The language of defendant’s special jury charge is similar to that found in LSA-R.S. 15:482, which provides in pertinent part that, “[a] legal presumption relieves him in whose favor it exists from the necessity of any proof; but may none the less be destroyed by rebutting evidence; ... [and] that evidence under the control of a party and not produced by him was not produced because it would not have aided him[.]”
 

 In
 
 State v.
 
 Ballay,
 
 [122]
 
 the defendant argued that the trial judge erred in failing
 
 *338
 
 to give the jury a special jury charge on legal presumptions under LSA-R.S. 15:482. The defendant contended that if the charge had been given the jury would have given greater weight to the fact that the State failed to present certain items as evidence. This Court found that the lack of production of the items went to the weight of the evidence. It also found that the trial court’s failure to read the defendant’s special jury charge was not a reversible error because there was no prejudice to the substantial rights of the defendant or the violation of a constitutional or statutory right.
 
 [123]
 

 In
 
 State v. Arnaud,
 

 [124]
 

 cited approvingly by this Court in
 
 Ballay,
 
 the Supreme Court found that the legal presumption in the defendant’s proposed special jury instruction was not wholly correct or pertinent because the items were not under the control of the State. The Supreme Court further found that whether the items were produced or not went to the weight of the evidence.
 
 [125]
 

 We find, as the courts did in
 
 Ballay
 
 and
 
 Amaud,
 
 that the lack of production of the items in question (the cab, the wallet, and the money, but not the trip log, since there was no proof that one actually existed) went to the weight of the evidence. We further find, as this Court did in
 
 Ballay,
 
 that the trial judge’s failure to read defendant’s special jury charge was not reversible error because there was no prejudice to the substantial rights of defendant or a violation of a constitutional or statutory right. We also find that the trial judge did not err by refusing to read defendant’s special jury instruction because it was not wholly correct under LSA-C.Cr.P. art. 807 in that it did not track the language of LSA-R.S. 15:432.
 

 This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER SIXTEEN
 
 — Refusing
 
 to inform the jury when the indictment was read that the indictment was not evidence
 

 The trial court violated due process by failing to inform the jury that the indictment is not evidence when the indictment was read.
 

 Defendant next argues that the trial judge erred by refusing to inform the jury at the time the indictment was read at the beginning of trial that the indictment was not evidence. The State responds that the trial judge provided the jury with the proper instructions on the law in general and the contested issue in particular at the appropriate time.
 

 | sSThe record reflects that during
 
 voir dire,
 
 the potential jurors were advised by the prosecutor that the fact that the grand jury issued an indictment meant “nothing,” and that it was merely a vehicle to get someone into court. After closing arguments, the trial judge instructed the jury in pertinent part as follows:
 

 The bill of indictment in this case is a mere accusation or charge against the defendant. The fact that such a bill of indictment has been filed is of no weight and does not carry any presumption of guilt. It is not evidence of the defendant’s guilt. You may not draw any inference of guilt against the defendant because of the filing of the bill of information.
 

 While LSA-C.Cr.P. art. 802 requires the trial court to charge the jury as to the law
 
 *339
 
 applicable to the case, the normal order of trial places the court’s charge after closing arguments by the parties.
 
 [126]
 

 In this case, the record shows that the trial judge properly charged the jury after closing arguments.
 

 This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER SEVENTEEN
 
 — Improper
 
 jury instruction that relieved the State of its burden of proof and other contested jury instructions
 

 The trial court erred by giving the jury instructions that relieved the State of its burden of proof, in violation of due process.
 

 Defendant contends next that the jury instructions unconstitutionally relieved the State of its burden of proof. He argues that the trial judge erred by instructing the jury that “it must decide whether a fact has been proven only from the evidence presented or from the lack of evidence.” The State responds that this charge has already been approved by this Court in other cases.
 

 The necessary elements of a jury charge are set forth in LSA-C.Cr.P. 804, which provides that:
 

 | 7qA. In all cases the court shall charge the jury that:
 

 (1)A person accused of crime is presumed by law to be innocent until each element of the crime, necessary to constitute his guilt, is proven beyond a reasonable doubt;
 

 (2) It is the duty of the jury, in considering the evidence and in applying to that evidence the law as given by the court, to give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence in the case; and
 

 (3) It is the duty of the jury if not convinced of the guilt of a defendant beyond a reasonable doubt, to find him not guilty.
 

 In
 
 State v.
 
 Mayeaux,
 
 [127]
 
 the trial judge charged the jury with an instruction identical to the one in this case. After reviewing the charge, this Court found that although the elements of LSA-C.Cr.P. art. 804 were “eminently paraphrased,” the charge properly instructed the jury in its duties. This Court took judicial cognizance of the fact that the same, or almost identical, general charge had been used by the judges of the 24th Judicial District Court for many years, and consequently, had been the subject of appellate scrutiny and appellate approval innumerable times in the past.
 
 [128]
 
 Accordingly, we find no error in this regard.
 

 In this assignment, defendant also argues that the trial judge erred by refusing his request to instruct the jury that, in a self-defense situation, the danger perceived by defendant “need not have been real.” He contends that the requested instruction was relevant and a correct statement of the law, and it should have been given under LSA-C.Cr.P. art. 807. The State responds that the trial judge was not required to give the requested
 
 *340
 
 instruction pursuant to Article 807, as its substance was included within the court’s general charge.
 

 The trial judge instructed the jury in pertinent part:
 

 A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing 171his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
 

 The question is whether the defendant under the circumstances as they appeared to him at the time of the incident, actually believed he was in imminent danger of bodily harm, and could reasonably hold that belief.
 

 LSA-C.Cr.P. art. 802 requires the trial court to charge the jury as to the law applicable to the case. Under LSA-C.Cr.P. art. 807, a requested special jury charge shall be given by the court if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. The special charge need not be given if it is included in the general charge or in another special charge to be given.
 
 [129]
 
 Failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right.
 
 [130]
 
 It is well settled that requested charges that are already substantially given and covered by the trial court’s general charge are properly refused.
 
 [131]
 

 Here, the instruction given to the jury correctly stated the law under LSA-R.S. 14:20(A)(1), which provides that a homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. The requested charge was already substantially given by the trial judge’s general charge, and therefore, the requested charge was properly refused. Accordingly, we find no error.
 

 In this assignment, defendant further argues that the trial judge erroneously included a jury instruction regarding the aggressor doctrine based on LSA-R.S. 14:21. He contends that there was no evidentiary basis for this instruction, and it 17pCould only have served to confuse or prejudice the jury. The State responds that the trial judge properly instructed the jury as to the aggressor doctrine pursuant to LSA-C.Cr.P. art. 802(1).
 

 The trial judge charged the jury in accordance with LSA-R.S. 14:21 as follows:
 

 A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
 

 In
 
 State v. London,
 

 [132]
 

 the State argued that the defendant shot the victim without justification; however, the defense argued the homicide was committed in self-defense, that is, the victim had a knife on the day of the shooting and was coming toward the defendant. This Court found that even if the jury believed the defen
 
 *341
 
 dant’s taped statements that the victim was the aggressor initially, they could have believed, also based on the defendant’s statements, that at some point the defendant became the aggressor. Accordingly, this Court found that the jury was properly charged on the aggressor doctrine.
 
 [133]
 

 In this case, defendant said in his statement to the police that the victim was injured after the victim pulled a gun on him while he was riding in the victim’s cab. Defendant claimed he grabbed the gun, and after a struggle, the victim was fatally shot. However, the evidence at trial showed that at some point, defendant gained control of the weapon and shot the victim five times, and that the victim’s hands were not on the gun at the time the shots were fired (based on the lack of stippling on the victim’s hands and wrists). Therefore, even if the jury believed that the victim was the aggressor initially, based on the evidence presented at trial, Ivathey could have also believed that at some point defendant became the aggressor.
 
 London, supra.
 

 We find no error in these contested jury instructions.
 

 ASSIGNMENT OF ERROR NUMBER EIGHTEEN
 
 — Refusing
 
 to give jury instruction that Louisiana law does not require a person to retreat or consider retreating before using deadly force
 

 The trial court erred by refusing to give the defense’s requested instruction in accordance with La. R.S. § U:20(D).
 

 Defendant next argues that the trial judge erred by refusing to give an instruction in accordance with LSA-R.S. 14:20(D) that Louisiana law does not require a person to retreat or consider retreating before using deadly force. The State contends that the trial judge properly declined to include the requested special charge in its instructions to the jury.
 

 Defendant requested the following jury instruction:
 

 In Louisiana, the law does not require a person to retreat or consider retreating before using deadly force. Therefore, a person has no duty whatsoever to retreat and may stand his ground and meet force with force. Accordingly, you may not consider the possibility of retreat as a factor in determining whether or not a person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary.
 

 LSA-R.S. 14:20(D) provides as follows:
 

 No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm or to prevent the unlawful entry.
 

 LSA-R.S. 14:20(D) was added to LSA-R.S. 14:20 by Acts 2006, No. 141 § 1, effective August 15, 2006. However, this Court has continued to recognize that while there is no unqualified duty to retreat from an altercation, the possibility |74of escape is a recognized factor in determining whether or not a defendant had a reasonable belief that deadly force was necessary to avoid the danger.
 
 [134]
 

 In this case, the trial judge did not err by refusing to give defense counsel’s jury instruction regarding there being no duty to retreat, because the jury instruction required a further explanation as to the possibility of escape being a recognized factor in determining whether defen
 
 *342
 
 dant had a reasonable belief that deadly force was necessary to avoid the danger.
 
 [135]
 

 This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER NINETEEN
 
 — Improper
 
 jury instruction that contained a Cage due process violation
 

 The trial court erred by giving jury instructions that contained, a Cage due process violation.
 

 Defendant further argues that the jury instructions contained a
 
 Cage
 
 violation because they suggested a higher degree of doubt than is required for acquittal under the reasonable doubt standard. In
 
 Cage v.
 
 Louisiana,
 
 [136]
 
 the U.S. Supreme Court held unconstitutional an instruction which “equated a reasonable doubt with a ‘grave uncertainty and ‘actual substantial doubt.’ ” In this case, the trial judge charged the jury as follows:
 

 While the State must prove guilt beyond a reasonable doubt, it does not have to prove guilt beyond all possible doubt. Reasonable doubt is doubt based on reason and common sense, and is present when, after you have carefully considered all the evidence, you cannot say that you are firmly convinced of the truth of the charge.
 

 Defendant objects to the instruction that the State did not have to prove guilt “beyond all possible doubt” and that reasonable doubt is based on “reason and |7ficommon sense.” The State responds that the instruction in question passes constitutional muster.
 

 In
 
 State v.
 
 Harris,
 
 [137]
 
 the defendant argued that the trial court gave the following improper instruction to the jury on reasonable doubt:
 

 ... While the state must prove guilt beyond a reasonable doubt, it does not have to prove guilt beyond all possible doubt.
 

 Reasonable doubt is doubt based on reason and common sense and is present when after you have carefully considered all of the evidence you cannot say that you are firmly convinced of the truth of the charge.
 

 The
 
 Harris
 
 Court found that the instruction tracked
 
 verbatim
 
 the proposed charge on reasonable doubt in the Louisiana Judge’s Criminal Bench Book. It also found that unlike the instruction in
 
 Cage,
 
 the trial judge’s charge did not overstate the degree of reasonable doubt required by the Due Process Clause. The Supreme Court in
 
 Harris
 
 also indicated that the instruction did not allow the jury to convict without satisfying the reasonable doubt requirement, and thus, it passed constitutional muster.
 
 [138]
 

 The instructions in this case were almost identical to those approved by the Supreme Court in
 
 Harris.
 

 This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER TWENTY
 
 — Improper
 
 jury instruction that the jury could not nullify its verdict
 

 The trial court erroneously instructed the jury that it could not nullify its verdict.
 

 Defendant argues next that the jury was erroneously instructed that it could not nullify the verdict. The State
 
 *343
 
 responds that this Court has previously approved the instruction at issue, and therefore, relief is not warranted.
 

 17fiThe trial judge instructed the jury as follows:
 

 You are prohibited by law and your oath from going beyond the evidence to find reasons to convict or to seek doubts upon which to acquit the defendant, but must confine yourselves strictly to a dispassionate consideration of the testimony given upon the trial. You must not resort to extraneous facts or circumstances in reaching your verdict. That is, you must not go beyond the evidence to find facts or circumstances upon which to convict or acquit, but must restrict yourselves to the evidence that you heard on the trial of this case, or lack of evidence.
 

 Jury nullification is a recognized practice that allows the jury to disregard uncontradicted evidence and instructions by the trial judge.
 
 [139]
 
 In
 
 State v.
 
 Divers,
 
 [140]
 
 the Court found no error in the lack of an instruction on jury nullification. The appellate court stated that the trial court gave detailed, correct instructions to the jury as to the general law, including instructions regarding the weight and credibility of the evidence, and their duty to accept the law as given. It noted that the defendant had cited no authority to support the argument that the jury should have been instructed that it was free to disregard the law. The appellate court concluded that the defendant had failed to show how the trial court’s refusal to instruct the jury to disregard the law and the evidence constituted a miscarriage of justice, prejudiced substantial rights of the defendant, or violated a constitutional or statutory right.
 
 [141]
 

 In this case, a review of the jury instructions shows that the trial judge gave detailed, correct instructions to the jury as to the general law, and that he did not specifically instruct the jury that it was prohibited from exercising its power to nullify its verdict. Additionally, defendant has failed to show how the trial court’s refusal to instruct the jury to disregard the law and the evidence constituted a[77miscarriage of justice, prejudiced substantial rights of defendant, or violated a constitutional or statutory right.
 

 Further, in
 
 State v.
 
 Jackson,
 
 [142]
 
 this Court approved a similar jury instruction, finding that it conveyed the essence of LSA-C.Cr.P. art. 804. In
 
 Jackson,
 
 this Court also stated that in
 
 State v. Mayeaux,
 

 [143]
 

 and
 
 State v.
 
 Humphrey,
 
 [144]
 
 it had found jury charges similar to the one in
 
 Jackson
 
 to be acceptable. Accordingly, we find that the trial judge did not err by refusing to instruct the jury on nullification.
 

 ASSIGNMENT OF ERROR NUMBER TWENTY-ONE
 
 — Improper
 
 jury instruction on robbery that lacked the element of criminal intent
 

 The trial court erred by giving robbery instructions that lacked the element of criminal intent.
 

 
 *344
 
 Here, defendant argues that the trial judge erroneously instructed the jury on the offenses of armed robbery, first degree robbery, and simple robbery because he did not include an instruction on criminal intent at the same time. He contends that this may have led the jury to convict without proof beyond a reasonable doubt of all elements of the crime. The State responds that the trial judge instructed the jury with regard to criminal intent, and that considering the jury instructions as a whole, reasonable persons of ordinary intelligence would have understood the charge.
 

 The trial judge instructed the jury with regard to criminal intent as follows:
 

 Criminal intent may be specific or general. Specific criminal intent is that state of mind which exists when the circumstances indicate that the defendant actively desired the prescribed criminal consequences to follow his act or failure to act. General criminal intent is present when the circumstances indicate that the defendant must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. General criminal intent is always present when there is specific intent. Whether criminal intent is present must be determined in light of | ^ordinary experience. Intent is a question of fact which may be inferred from the circumstances.
 

 A short while later, the trial judge instructed the jury as to the elements of second degree murder, armed robbery, first degree robbery, and simple robbery.
 

 When considering an allegedly improper jury instruction, a reviewing court must determine whether it is “reasonably likely” that the jury applied the challenged instruction in an unconstitutional manner, not whether it is possible that the jury misapplied the instruction.
 
 [145]
 
 In determining whether it is reasonably likely that the jurors applied the instruction unconstitutionally, the challenged terms are considered in relation to the instructions as a whole.
 
 [146]
 
 The test is whether, taking the instructions as a whole, reasonable persons of ordinary intelligence would understand the charge.
 
 [147]
 
 A conviction will not be reversed on grounds of an erroneous jury charge unless the disputed portion, when considered in connection with the remainder of the charge, is erroneous and prejudicial.
 
 [148]
 

 In this case, the trial judge explained that criminal intent may be specific or general. He then designated which offenses required specific intent. Considering the instructions as a whole, reasonable persons of ordinary intelligence would have understood the instructions to indicate that the remaining offenses required only general criminal intent. Accordingly, we find that the trial judge did not erroneously instruct the jury on the offenses of armed robbery, first degree robbery, and simple robbery.
 

 This assignment of error is without merit.
 

 
 *345
 
 |
 
 ASSIGNMENT OF ERROR NUMBER TWENTY-TWO
 
 — Refusal
 
 to include negligent homicide as responsive verdict in jurg instructions
 

 The trial court erred by refusing to include negligent homicide as a responsive verdict.
 

 In this assignment of error, defendant contends that the trial judge erred by refusing to include negligent homicide as a responsive verdict. He contends that negligent homicide is a responsive verdict to second degree murder under LSA-C.Cr.P. art. 814(A)(3), and that the evidence supported such an instruction. The State responds that the evidence would not have permitted a finding that defendant was guilty of negligent homicide, and therefore, the trial judge properly excluded it under LSA-C.Cr.P. art. 814(C).
 

 At the time of trial in 2009, LSA-C.Cr.P. art. 814(A)(3) listed the responsive verdicts for second degree murder as guilty, guilty of manslaughter, guilty of negligent homicide, and not guilty.
 
 [149]
 
 LSA-C.Cr.P. art. 814(C) provides that upon motion of the State or the defendant, or on its own motion, the court shall exclude a responsive verdict listed in Paragraph A if, after all the evidence has been submitted, the evidence, viewed in a light most favorable to the State, is not sufficient reasonably to permit a finding of guilty of the responsive offense.
 

 LSA-R.S. 14:32(A)(1) provides that negligent homicide is the killing of a human being by criminal negligence. Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
 
 [150]
 

 | snThe evidence showed that the victim died after he was shot five times by defendant. Defendant did not sustain any injuries. The victim, while dying, told Mr. Belile that he had been robbed. Ronald Singer, defendant’s expert, testified that the gun did not have a light trigger pull, and that there was no way for it to accidentally discharge five times. Accordingly, we find that the trial judge did not err by refusing to give the requested charge on negligent homicide because there was no evidence from which the jury could have inferred guilt of that lesser offense. Moreover, we note that the trial judge included the lesser included verdict of manslaughter, but it was rejected by the jury when it returned its verdict of guilty as charged.
 

 This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER TWENTY-THREE
 
 — Refusal
 
 to instruct the jury on “accident
 
 ”
 

 The trial court erred by refusing to instruct the jury on “accident.
 
 ”
 

 In this assignment of error, defendant contends that the trial judge erred by refusing to instruct the jury on “accident.” At trial, defense counsel asked for an instruction on accident or unintentional killing, alleging that there was evidence that defendant could have pulled the trigger accidentally during the struggle. The trial judge responded that he would not give
 
 *346
 
 instructions on “accident,” and defense counsel noted his objection.
 

 As in the immediately previous assignment of error, we find that the trial judge did not err by refusing to give the requested charge on “accident” because the record reflects that there was insufficient evidence from which the jury could have inferred that defendant’s shooting of the victim was indeed accidental.
 

 This assignment of error is without merit.
 

 |
 
 ^ASSIGNMENT OF ERROR NUMBER TWENTY-FOUR
 
 — Refusing
 
 to give jurg instruction as to the requirement of unanimous verdict as to all elements in dispute
 

 The trial court erred by refusing to require a unanimous verdict as to the elements in dispute.
 

 Defendant argues that the trial judge erred by refusing to instruct the jury that it must be unanimous as to which theory of second degree murder it applied to convict (i.e., intentional murder, or causing death during an enumerated felony, and if so, which felony) and the factual predicate for the verdict. The State responds that the trial judge properly denied defendant’s request.
 

 The trial judge instructed the jury on both theories of second degree murder. The jury was not polled regarding which theory of second degree murder the conviction was based upon.
 

 A jury is not constitutionally required to agree on a single theory to convict a defendant where it is instructed as to alternative theories.
 
 [151]
 
 Accordingly, we find no error in the trial court’s lack of instruction to the jury in this regard.
 

 ASSIGNMENT OF ERROR NUMBER TWENTY-FIVE
 
 — Improper
 
 denial of Motion to Quash for Improper Venue
 

 Mr. Seals was denied his right to a fair trial in the parish in which the offense occurred.
 

 Defendant next contends that the trial judge erred by denying his Motion to Quash for Improper Venue. He argues that venue was proper in Orleans Parish because the acts constituting the offense occurred in that parish. The State responds that the trial judge correctly determined that venue was proper in Jefferson Parish.
 

 | ^Following the denial of defendant’s Motion to Quash for Improper Venue, defendant filed a writ application with this Court, which denied the writ, stating in pertinent part:
 

 It is undisputed that the victim’s body was found in Jefferson Parish. Relator claims that the venue is improper in Jefferson Parish because the substantial elements of the alleged second degree murder all occurred in Orleans Parish. It is noted that relator did not attach his statements to his Motion to Quash. After considering the motion and the opposition, the trial court obviously concluded that venue was appropriate in Jefferson Parish. Relator has not shown any basis for disturbing the trial judge’s ruling.
 
 [152]
 

 In this case, defendant’s statements were not attached to his writ appli
 
 *347
 
 cation to this Court; however, they are contained in the appellate record. Accordingly, we shall consider this issue on appeal.
 

 Article I, Section 16 of the Louisiana Constitution provides that every person charged with a crime has the right to an impartial trial “in the parish where the offense or an element of the offense occurred, unless venue is changed in accordance with the law.”
 
 [153]
 

 LSA-C.Cr.P. art. 611 provides in pertinent part:
 

 A. All trials shall take place in the parish where the offense has been committed, unless the venue is changed. If acts constituting an offense or if the elements of an offense occurred in more than one place, in or out of the parish or state, the offense is deemed to have been committed in any parish in this state in which any such act or element occurred.
 

 B. If the offender is charged with the crime of first or second degree murder and it cannot be determined where the offense or the elements of the offense occurred, the offense is deemed to have been committed in the parish where the body of the victim was found.
 

 The location of an offense is determined from the nature of the crime alleged and the location of the act(s) constituting it.
 
 [154]
 
 A court must first identify the Issconduct of the offense and then discern the location of the commission of the criminal acts.
 
 [155]
 

 Defendant claims that the venue is improper in Jefferson Parish because the substantive elements of the alleged second degree murder all occurred in Orleans Parish. Defendant asserted in his statement to the police that the victim was wounded after the victim pulled a gun on him in New Orleans while he was riding in the victim’s cab. Defendant claimed he grabbed the gun, and after a struggle, the victim was fatally shot. Defendant then drove the cab onto the Earhart Expressway, exiting at Clearview Parkway in Jefferson Parish, where he contended that the victim fell from the cab.
 

 At trial, Kevin Belile testified that he discovered the victim as he lay dying on the side of the Earhart Expressway at the Clearview Parkway exit. The victim told Mr. Belile that a man robbed and shot him and that the robber took his cab. As such, the State contends that venue was proper in Jefferson Parish.
 

 The record reflects that the exact location of where the victim was fatally shot is unclear. However, it is undisputed that the victim’s body was found in Jefferson Parish. It is also undisputed that defendant took the victim’s cab and keys and left the victim on the side of the road in Jefferson Parish. Additionally, bloody money was found on defendant. Accordingly, we find no merit to this assignment of error and no basis to disturb this Court’s prior ruling that venue was proper in Jefferson Parish.
 

 |
 
 ^ASSIGNMENT OF ERROR NUMBER TWENTY-SIX
 
 — Improper
 
 introduction of improperly seized evidence
 

 The trial court erred in allowing the State to introduce evidence seized in
 
 
 *348
 

 violation of the Fourth and Fourteenth Amendments and Article I, Section 5 of the Louisiana Constitution.
 

 ASSIGNMENT OF ERROR NUMBER TWENTY-SEVEN
 
 — Improper
 
 introduction of statements that were the fruit of an unlawful search and seizure
 

 The trial court violated Mr. Seals’ rights under the Fourth, Fifth, and Fourteenth Amendments in allowing the State to introduce two statements of Mr. Seals that were the fruit of an unlawful search and seizure.
 

 In these assignments of error, defendant argues that Lt. Merida did not have probable cause to stop and search the White Fleet cab in which he was a passenger, and therefore, the evidence and statements obtained afterward should have been suppressed. He contends that this was not a
 
 Terry
 

 [156]
 

 stop, because Lt. Merida went far outside the limited, brief, and non-threatening character of a
 
 Terry
 
 stop. Defendant further argues that Lt. Merida’s testimony regarding the stop was unrealistic and unreliable in light of the testimony of Jayce Burbank, the driver of the White Fleet cab. The State responds that the trial judge’s ruling denying the motion to suppress evidence and statements was proper.
 

 The Fourth Amendment to the United States Constitution and Article I, § 5 of the Louisiana Constitution prohibit unreasonable searches and seizures.
 
 [157]
 
 If evi-denee is derived from an unreasonable search or seizure, the proper remedy is to exclude the evidence from trial.
 
 [158]
 

 In a hearing on a motion to suppress, the State bears the burden of proof in establishing the admissibility of evidence seized without a warrant.
 
 [159]
 
 The trial court’s denial of a motion to suppress is afforded great weight, and it will not be set aside unless the preponderance of the evidence clearly favors suppression. To 18⅞determine whether the trial court’s denial of a motion to suppress is correct, the appellate court may consider the evidence adduced at the suppression hearing as well as the evidence presented at trial.
 
 [160]
 

 It is well established that a police officer may conduct a brief investigatory stop when the officer has a reasonable articulable suspicion of criminal activity.
 
 [161]
 
 Reasonable suspicion is something less than probable cause to arrest. Rather, it requires that officers have sufficient knowledge of the facts and circumstances to justify an infringement of an individual’s right to be free of government interference.
 
 [162]
 

 The facts upon which an officer bases an investigatory stop should be evaluated in light of the circumstances surrounding the incident. A reviewing court must take into consideration the totality of the circumstances and give deference to the inferences and deductions of a trained
 
 *349
 
 police officer that might elude an untrained person.
 
 [163]
 

 As to defendant’s statements, the State has the burden of proving the admissibility of a purported confession or statement by the defendant.
 
 [164]
 
 Before an incul-patory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his
 
 Miranda
 
 rights, that he voluntarily and intelligently waived his
 
 Miranda
 
 rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement, or promises.
 
 [165]
 

 igflA determination of voluntariness is made on a case-by-case basis, depending on the totality of the facts and circumstances of each situation. The admissibility of a confession or statement is a determination for the trial judge and the judge’s conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence.
 
 [166]
 

 Lt. Merida and Sergeant Toca testified at the suppression hearing.
 
 [167]
 
 After listening to the testimony at the suppression hearing, the trial judge denied the motions.
 

 Defendant argues that the trial court erred in ruling that his in-custody statements were made freely and voluntarily and in denying his motion to suppress the statements. We note that in defendant’s first appeal, where he made the same arguments he now makes, the Louisiana Supreme Court found that what Merida knew, combined with what he observed when the White Fleet cab caught his attention, constituted the degree of information necessary to justify the investigatory stop he conducted.
 
 [168]
 
 The Supreme Court further found that Merida’s suspicions were strengthened when he viewed the bloody defendant and his bloody possessions in a plastic grocery bag on the passenger side of the front of the cab, and that Merida’s testimony provided ample evidence that Seals was given the proper
 
 Miranda
 
 warnings at the scene of the stop.
 
 [169]
 
 The
 
 Seals
 
 court stated that Meri-da’s testimony established that he heard the description of a black mustached man wearing a red cap broadcast in connection with an armed robbery-murder report involving a cab, and that Merida’s sighting of defendant, a mustached black male wearing a red cap and riding in a cab, constituted reasonable cause to justify |87an investigatory stop, especially because he observed defendant slouch in his seat when they made eye contact.
 
 [170]
 

 We find that this record shows that Lt. Merida had reasonable suspicion to justify an investigatory stop of the White Fleet cab in which defendant was a passenger. Additionally, the record shows that Lt. Merida and Sergeant Toca proper
 
 *350
 
 ly
 
 Mirandized
 
 defendant at the appropriate times, that defendant voluntarily and intelligently waived his
 
 Miranda
 
 rights, and that the statements were made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement, or promises.
 

 The trial judge apparently found the testimony of Lt. Merida and Sergeant Toca credible. Although defendant contends that Lt. Merida’s testimony was not credible in light of Mr. Burbank’s testimony, the credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of witnesses will not be reweighed on appeal.
 
 [171]
 
 ,
 
 [172]
 
 Moreover, a review of Lt. Merida and Sergeant Toca’s testimony shows that the inconsistencies therein did not pertain to material issues.
 

 We find no merit to these assignments of error.
 

 \ ASSIGNMENT OF ERROR NUMBER TWENTY-EIGHT
 
 — Improper
 
 grand jury indictment
 

 Discrimination in the selection of the grand jury foreperson violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and requires reversal.
 

 Here, defendant argues that his State and federal rights were violated when he was tried pursuant to an indictment infected by race discrimination. He contends that the State went to trial on an amended 1991 indictment that was returned by a Jefferson Parish grand jury in 1991. Defendant notes that the 1991 grand jury was comprised of no African-Americans and three females, even though African-Americans and females constituted twenty percent and twelve-and-one-half percent of the census, respectively.
 

 The State responds that defendant is precluded from raising this claim because he did not re-assert a motion to quash or challenge the sufficiency of the amended indictment by way of a motion to quash. Alternatively, the State contends that defendant would not be entitled to relief even if the claim had not been waived, because the filing of the 2004 superseding indictment dismissed the initial 1991 indictment, and defendant was indicted by a constitutionally composed grand jury in 2004.
 

 The record reflects that defendant was initially indicted for first degree murder on August 15, 1991. Defendant was granted a new trial on October 25, 2002.
 
 [173]
 
 On March 15, 2004, defendant filed a “Motion to Quash the Indictment Based on Discrimination in the Selection of Grand Jury Forepersons and the Improper Exclusion of Jurors from the Grand Jury Process.” Afterward, a new Jefferson Parish Grand Jury indicted defendant again for first degree murder on April 15, 2004. On June 27, 2006, the State amended the 1991 indictment by reducing the charge from first degree murder to second degree murder in violation |89of LSA-R.S. 14:30.1. On Sep
 
 *351
 
 tember 29, 2006, defense counsel saw the amended bill. Defendant was subsequently arraigned on that same date on the amended bill and pled not guilty.
 

 In
 
 State v.
 
 Jacobs,
 
 [174]
 
 the Jefferson Parish grand jury indicted the defendant in 1996 and again in 2002 for first degree murder. In 2005, the State amended the original 1996 indictment to reduce the charges to second degree murder. This Court found that the State’s 2005 amendment of the 1996 indictment was problematic. However, this Court noted that the defendant had not challenged the sufficiency of the amended indictment by way of a motion to quash, and that a post-verdict attack on the sufficiency of an indictment did not provide grounds for setting aside a conviction unless the indictment failed to give fair notice of the offense charged, or failed to set forth any identifiable offense.
 
 [175]
 

 In this case, defendant did not challenge the sufficiency of the amended indictment by way of a motion to quash under LSA-C.Cr.P. arts. 581 and 532. In fact, at the hearing on April 16, 2004, defense counsel admitted that his motion to quash was moot because there was a new indictment, and the trial judge agreed. Both this Court and the Louisiana Supreme Court have held that a post-verdict attack on the sufficiency of an indictment does not provide grounds for setting aside a conviction unless the indictment failed to give fair notice of the offense charged, or failed to set forth any identifiable offense.
 
 [176]
 
 As such, we find that defendant’s post-verdict attack on the sufficiency of the indictment does not provide grounds for setting his conviction aside because the amended indictment | !ingave defendant fair notice that he was being charged with second degree murder. Accordingly, as did the Court in
 
 Jacobs,
 
 we find no error.
 

 Additionally, this Court has held that a superseding indictment implicitly dismisses a first indictment.
 
 [177]
 
 In this case, the 2006 indictment superseded the 1991 indictment. Since the prosecutor made the June 27, 2006 handwritten amendment on the superseded (1991) indictment, the question is whether that amendment was valid.
 

 District attorneys are empowered to amend grand jury indictments to charge lesser offenses.
 
 [178]
 
 The State may abandon a charge for a lesser offense without the necessity of a formal indictment.
 
 [179]
 
 Second degree murder is a responsive verdict to first degree murder. Thus, the State in this case had the authority to reduce the charge without involving the grand jury. Moreover, the State was not
 
 *352
 
 required to make a formal written or oral amendment to the indictment in order to properly reduce the charge from first degree to second degree murder.
 

 The purpose of requiring the State to file an amendment to an indictment before trial is to provide the defendant with adequate notice of the crime for which he is charged so that he can properly prepare his defense.
 
 [180]
 
 In a case such as this one, where the charge is reduced from first degree murder to second degree murder, defendant cannot complain of lack of notice, since the charge of second degree murder does not change the notice as to the crime charged. All of the elements of second degree murder are included within the greater offense of first degree murder.
 
 [181]
 

 In
 
 State v.
 
 Domingue,
 
 [182]
 
 a case factually similar to this one, the defendant was charged by grand jury indictment with first degree murder. On the day of trial, the |91State amended the indictment, reducing the charge to second degree murder. A jury found the defendant guilty as charged. On appeal, the defendant’s conviction and sentence were reversed, and the case was remanded for a new trial. The defendant was then retried for second degree murder, and was found guilty by a jury of the responsive offense of manslaughter. The First Circuit affirmed the defendant’s conviction and sentence on appeal.
 
 [183]
 

 On error patent review, the
 
 Domingue
 
 court noted that the indictment did not reflect the amendment of the charge from first degree murder to second degree murder. But the court declined to take corrective action, stating, “Since second degree murder is a lesser included offense of first degree murder, the state may abandon the charge of the greater crime and proceed with the prosecution of the lesser, and no formal amendment of the indictment is necessary.”
 
 [184]
 

 In view of the holding in
 
 Domingue,
 
 we find that the State in this case validly reduced the charge against defendant to second degree murder, regardless of whether the written amendment was made to the correct version of the indictment.
 

 This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER TWENTY-NINE
 
 — Improper
 
 expansion of indictment
 

 The trial court erred by allowing the State to expand the indictment and narrow its burden of proof at trial, in violation of due process and La.C.Cr.P. art. Jp6P
 

 Defendant argues next that the trial judge erred by allowing the State to orally amend the indictment to include alternative theories of second degree murder, thereby expanding the scope of the indictment. The State responds that 192the trial judge’s actions did not constitute an amendment of the indictment, and even if they did, defendant waived the issue on appeal because he did not object. The State further responds that defendant was not prejudiced by the trial judge’s actions as defendant was aware of the nature of the charge against him and the manner in which the State maintained he had committed the crime.
 

 
 *353
 
 At trial, it appears that the clerk mistakenly read from the indictment that defendant committed second degree murder while engaged in the perpetration of an armed robbery — language that was included in the first degree murder indictment. The prosecutor noted that the clerk had read the statute for first degree murder, and that the clerk should have read that defendant committed second degree murder. The trial judge replied that he was going to read the second degree murder statute to the jury. Defense counsel did not object; however, he asked the trial judge to read the instructions on self-defense and accident at the same time. The trial judge refused, and defense counsel noted his objection.
 

 The trial judge subsequently read the second degree murder statute to the jury. He stated that the indictment was based on LSA-R.S. 14:30.1, which provided that second degree murder was the killing of a human being when the offender had a specific intent to kill or to inflict great bodily harm or when the offender was engaged in the perpetration or attempted perpetration of armed robbery, first degree robbery, or simple robbery, even though he had no intent to kill or to inflict great bodily harm.
 

 We find that the trial judge’s actions did not constitute an amendment to the indictment. Rather, it appears that the trial judge was attempting to rectify the mistake of the clerk by telling the jury the indictment was based on the second degree murder statute and then reading that statute to them. However, even if the trial judge’s actions were considered an amendment, defendant is precluded from |93raising this claim on appeal because he did not object to the alleged amendment, nor did he request a continuance or mistrial.
 
 [185]
 
 In any event, we find that defendant is not entitled to relief.
 

 In
 
 State v. Sorina,
 

 [186]
 

 the defendant alleged that the trial court erred in not declaring a mistrial when the State amended the indictment from first to second degree murder after the commencement of trial. On appeal, the defendant objected to a discussion between the prosecutor and the trial judge wherein the prosecutor deleted certain language in the indictment. This discussion occurred while the minute clerk was reading the indictment. The Fourth Circuit noted that the amendment to the indictment was made two months prior to trial, and that due to an apparent clerical error, language pertaining to the first degree murder charges remained on the amended indictment. The Fourth Circuit did not find a mistrial was warranted based on these circumstances.
 
 [187]
 

 In this case, as in
 
 Sorina,
 
 the amendment to the indictment was made prior to the commencement of trial, and due to an apparent clerical error, language pertaining to the first degree murder charge remained on the amended indictment.
 

 Further, we have already found that defendant was not prejudiced since the record indicates he had adequate notice of the crime for which he was charged. On June 27, 2006, the State amended the original indictment by reducing the charge from first to second degree murder in violation of LSA-R.S. 14:30.1. Defendant
 
 *354
 
 was arraigned on the amended indictment on September 29, 2006, and pled not guilty. Because he did not seek clarification through a bill of particulars after the amendment of the indictment, the State was not limited in establishing any of the | ;l4feIonies enumerated in LSA-R.S. 14:30.1.
 
 State v.
 
 McCartney
 
 [188]
 
 held that the State was not limited in establishing any of the felonies enumerated in LSA-R.S. 14:30.1 because the defendant failed to file a bill of particulars asking the State to designate the underlying felony it intended to prove in developing its prosecution for second degree murder after the indictment was amended.
 

 Further, the record indicates that defendant in this case was aware that the State would attempt to establish that he committed the crime under either the specific intent theory or the felony/murder theory based on armed robbery, first degree robbery, or simple robbery. During
 
 voir dire,
 
 both the prosecutor and defense counsel discussed with the jury the two different ways the State could prove second degree murder. Also, as was stated previously, the prosecutor and defense counsel agreed that the clerk should have read the indictment charging defendant with second degree murder, and the trial judge clarified that the predicate charges were the three types of robberies that had been previously discussed.
 

 This assignment of error is without merit.
 

 ASSIGNMENT OF ERROR NUMBER THIRTY
 
 — Cumulative
 
 effect of errors
 

 The cumulative effect of the errors requires reversal.
 

 Finally, defendant argues that while each of the aforementioned rulings was legally unfounded and caused prejudice to the defense case as a whole, the cumulative effect of the rulings unfairly prejudiced the defense in a way that was both substantial and insurmountable.
 

 The combined effect of assignments of error, none of which warrant reversal on its own, does not deprive a defendant of his right to a constitutionally fair 19Btrial.
 
 [189]
 
 The Supreme Court has noted that the “cumulative error” doctrine has lost favor in the Louisiana courts.
 
 [190]
 
 Significantly, the Supreme Court in
 
 State v.
 
 Manning
 
 [191]
 
 quoted with approval
 
 Mullen v. Blackburn,
 

 [192]
 

 where the federal Fifth Circuit rejected the cumulative error doctrine by noting that “twenty times zero equals zero.”
 
 [193]
 

 This assignment of error is without merit.
 

 ERRORS PATENT REVIEW
 

 The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920,
 
 State v. Oliveaux,
 

 [194]
 

 and
 
 State v. Weiland.
 

 [195]
 
 We find no errors patent requiring corrective action.
 

 
 *355
 

 CONCLUSION
 

 Accordingly, for the foregoing reasons, we affirm defendant’s conviction and sentence.
 

 AFFIRMED
 

 [1]
 

 .
 
 State v. Seals,
 
 95-305 (La.11/25/96), 684 So.2d 368,
 
 cert. denied,
 
 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997).
 

 [2]
 

 .
 
 State ex rel. Seals v. State,
 
 00-2738 (La.10/25/02), 831 So.2d 828.
 

 [3]
 

 . In this case, Mr. Belile testified that he "clocked out” that day at 10:30 p.m.
 

 [4]
 

 .It is noted that Mr. Belile did not testily in this case that the brown paper bag appeared to him to include a cab driver's trip records. He only testified in this case that he grabbed a Schwegmann's bag and put it under Mr. Fee-ney’s head.
 

 [5]
 

 . It is noted that in this case, Mr. Belile testified that his father was an N.O.P.D. officer; however, he did not specify the years.
 

 [6]
 

 . At trial in this case, Merida was referred to as "Lieutenant.”
 

 [7]
 

 . It is noted that in this case, Merida did not refer to the perpetrator as a “Negro male,” nor did he testily that he heard that the cab driver was shot on the Earhart Expressway. He referred to the perpetrator as a "black male."
 

 [8]
 

 . At the trial in this case, Merida testified that he heard two "locals" over the radio that interested him, after which he began looking for a white Chevrolet cab and a black male with a mustache who was wearing a red baseball-type cap. Merida further testified that he also heard information over the radio about a shooting and possible murder of a cab driver.
 

 [9]
 

 . In this case, Merida testified at trial that the bloody clothing was in a paper bag.
 

 [10]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [11]
 

 .
 
 State v. Seals,
 
 95-305 at 1-5, 684 So.2d at 370-73.
 

 [12]
 

 .
 
 State v. Hearold,
 
 603 So.2d 731, 734 (La.1992).
 

 [13]
 

 .
 
 Id.
 

 [14]
 

 . 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
 

 [15]
 

 .
 
 See State v. Ortiz,
 
 96-1609, p. 12 (La.10/21/97), 701 So.2d 922, 930,
 
 cert. denied,
 
 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998);
 
 State v. Bailey,
 
 04-85, p. 4 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 954-55,
 
 writ denied,
 
 04-1605 (La. 11/15/04), 887 So.2d 476,
 
 cert. denied,
 
 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005).
 

 [16]
 

 .
 
 State v. Harrell,
 
 01-841, p. 7 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019.
 

 [17]
 

 .
 
 State v. Kempton,
 
 01-572, p. 7 (La.App. 5 Cir. 12/12/01), 806 So.2d 718, 722.
 

 [18]
 

 . LSA-R.S. 15:438.
 

 [19]
 

 .
 
 State v. Durand,
 
 07-4, p. 8 (La.App. 5 Cir. 6/26/07), 963 So.2d 1028, 1034,
 
 writ denied,
 
 07-1545 (La.1/25/08), 973 So.2d 753.
 

 [20]
 

 .
 
 State v. Mitchell,
 
 99-3342, p. 7 (La.10/17/00), 772 So.2d 78, 83.
 

 [21]
 

 . LSA-R.S. 14:10(1).
 

 [22]
 

 .
 
 State v. Durand,
 
 07-4 at 9, 963 So.2d at 1034.
 

 [23]
 

 . LSA-R.S. 14:64.
 

 [24]
 

 . LSA-R.S. 14:64.1.
 

 [25]
 

 . LSA-R.S. 14:65.
 

 [26]
 

 .
 
 State v. Brown,
 
 414 So.2d 726, 728 (La.1982);
 
 State v. Theriot,
 
 07-71, p. 13 (La.App. 5 Cir. 6/26/07), 963 So.2d 1012, 1020,
 
 writ denied,
 
 07-1598 (La.2/1/08), 976 So.2d 715.
 

 [27]
 

 .
 
 State v. Hyman,
 
 09-409, pp. 9-10 (La.App. 5 Cir. 2/9/10), 33 So.3d 271, 278,
 
 writ denied,
 
 10-548 (La.10/1/10), 45 So.3d 1094.
 

 [28]
 

 .Detective Glenn Toca also testified that the money depicted in Exhibits 42 through 45 was on defendant’s person when he came into the bureau, and that those photographs accurately depicted the condition of the money with the red blood-like substance on it.
 

 [29]
 

 . In his first appeal, defendant also argued that the evidence was insufficient to show that he committed an armed robbery. The Louisiana Supreme Court found that the denominations of the money depicted in the three photographic exhibits showing the bloodied bills constituted graphic evidence which the jury could have considered proof that Mr. Seals acquired this money by robbing the cab driver he admitted he shot. The Supreme Court stated that it would seem to be common knowledge that a cab driver was a worker whose occupation fairly called for the possession of reasonable amounts of small bills to make change for his fares. The Supreme Court also found that the defense erred in its argument that Mr. Belile’s recounting of Mr. Feeney’s statement that a robbery occurred was the only evidence of the commission of a robbery.
 
 State v. Seals,
 
 95-305 at 6, 684 So.2d at 374.
 

 [30]
 

 . In his first appeal, defendant argued that there was insufficient evidence of the requisite criminal intent. The Louisiana Supreme Court stated that the circumstantial evidence, not the least of which was the number of shots fired and the wounds inflicted on the victim (five shots in all), pointed to the presence of specific intent to kill or inflict great bodily harm. The Supreme Court found that the evidence was sufficient to show that the defendant possessed the specific intent to kill or inflict great bodily harm when he repeatedly shot the victim.
 
 State v. Seals,
 
 95-305 at 7, 684 So.2d at 374.
 

 [31]
 

 .
 
 State v. Rowan,
 
 97-21, p. 7 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.
 

 [32]
 

 . 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
 

 [33]
 

 . Batson,
 
 476 U.S. at 94, 106 S.Ct. at 1721, 90 L.Ed.2d at 86;
 
 State v. Joseph,
 
 01-360, pp. 5-6 (La.App. 5 Cir. 10/17/01), 802 So.2d 735, 739,
 
 writ denied,
 
 02-232 (La.12/13/02), 831 So.2d 979.
 

 [34]
 

 .
 
 State v. Green,
 
 94-0887, p. 24 (La.5/22/95), 655 So.2d 272, 288.
 

 [35]
 

 .
 
 Id.
 

 [36]
 

 .
 
 State v. Perrilloux,
 
 03-917, p. 4 (La.App. 5 Cir. 12/30/03), 864 So.2d 843, 847,
 
 writ denied,
 
 04-418 (La.6/25/04), 876 So.2d 830.
 

 [37]
 

 .
 
 Purkett v. Elem,
 
 514 U.S. 765, 767, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 839 (1995).
 

 [38]
 

 .
 
 Purkett,
 
 514 U.S. at 768, 115 S.Ct. at 1771, 131 L.Ed.2d at 839;
 
 State v. Joseph, supra.
 

 [39]
 

 .
 
 State v. Jones,
 
 98-842, p. 8 (La.App. 5 Cir. 2/10/99), 729 So.2d 57, 62.
 

 [40]
 

 .
 
 Purkett, supra; Batson, supra.
 

 [41]
 

 .
 
 State v. Hobley,
 
 98-2460, pp. 19-20 (La.12/15/99), 752 So.2d 771, 783,
 
 cert. denied,
 
 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000).
 

 [42]
 

 .
 
 Id.,
 
 98-2460 at 20, 752 So.2d at 783.
 

 [43]
 

 .
 
 State
 
 v.
 
 Robinson,
 
 04-964, p. 10 (La.App. 5 Cir. 2/15/05), 896 So.2d 1115, 1123.
 

 [44]
 

 .
 
 Id.
 

 [45]
 

 .
 
 State v. Gant,
 
 06-232, p. 21 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099, 1118,
 
 writ denied,
 
 06-2529 (La.5/4/07), 956 So.2d 599.
 

 [46]
 

 .
 
 Id.,
 
 06-232 at 21, 942 So.2d at 1118-19.
 

 [47]
 

 . The second and third steps of the
 
 Batson
 
 analysis are not reached because the trial judge did not find a prima facie case was made with regard to any of the potential jurors in question.
 

 [48]
 

 .
 
 See State v. Wilson,
 
 09-170, p. 14 (La.App. 5 Cir. 11/10/09), 28 So.3d 394, 405,
 
 writ denied,
 
 09-2699 (La.6/4/10), 38 So.3d 299, where this Court found that the record did not reflect that the prosecutor's reasons for excusing a potential juror were a pretext for race, noting that the record contained several instances indicating the prosecutor was concerned about all the prospective jurors' feelings about sitting in judgment of another.
 

 [49]
 

 .
 
 See Berry v. State,
 
 802 So.2d 1033, 1044 (Miss.2001),
 
 cert. denied,
 
 537 U.S. 828, 123 S.Ct. 125, 154 L.Ed.2d 42 (2002), and the citations therein.
 

 [50]
 

 .See Wood v. State,
 
 715 So.2d 812, 816-17 (Ala.Cr.App.1996),
 
 affirmed,
 
 715 So.2d 819 (Ala.1998), ce
 
 rt. denied,
 
 525 U.S. 1042, 119 S.Ct. 594, 142 L.Ed.2d 536 (1998), where the court found that the State had a race-neutral reason for striking a potential juror who said he needed to be at work so that he could earn the money to meet his child support obligations.
 

 [51]
 

 . 06-232 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099,
 
 writ denied,
 
 06-2529 (La.5/4/07), 956 So.2d 599.
 

 [52]
 

 .
 
 Id.,
 
 06-232 at 21-24, 942 So.2d at 1119-20.
 

 [53]
 

 . State v. Heard,
 
 40,284, p. 9 (La.App. 2 Cir. 12/14/05), 917 So.2d 658, 665,
 
 writs denied,
 
 06-188 (La.6/16/06), 929 So.2d 1285 and 06-781 (La.10/6/06), 938 So.2d 71.
 

 [54]
 

 . La. Const. Art. I, § 17; LSA-C.Cr.P. art. 788.
 

 [55]
 

 .
 
 See
 
 LSA-C.Cr.P. art. 790.
 

 [56]
 

 . "A juror temporarily accepted and sworn in accordance with LSA-C.Cr.P. art. 788 may nevertheless be challenged peremptorily prior to the swearing of the jury panel in accordance with LSA-C.Cr.P. Art. 790.”
 
 State v. Watts,
 
 579 So.2d 931 (La.1991) citing LSAC. Cr.P. art. 795(B)(1). LSA-C.Cr.P. art. 795(B)(1) provides that peremptory challenges shall be exercised prior to the swearing of the jury panel.
 

 [57]
 

 .
 
 State v. Plaisance,
 
 00-1858, p. 30 (La.App. 4 Cir. 3/6/02), 811 So.2d 1172, 1193, n. 4,
 
 writ denied,
 
 02-1395 (La.11/27/01), 831 So.2d 270,
 
 cert. denied,
 
 538 U.S. 1038, 123 S.Ct. 2084, 155 L.Ed.2d 1071 (2003).
 

 [58]
 

 .
 
 State v. Hailey,
 
 02-1738, p. 9 (La.App. 4 Cir. 9/17/03), 863 So.2d 564, 569,
 
 writ denied,
 
 04-612 (La.2/18/05), 896 So.2d 20.
 

 [59]
 

 . This article was added in 2006 to codify the holding of earlier cases that recognized a party’s right to backstrike.
 

 [60]
 

 . State v. Stukes,
 
 08-1217, p. 18 (La.App. 4 Cir. 9/9/09), 19 So.3d 1233, 1246,
 
 writ denied,
 
 09-2194 (La.4/9/10), 31 So.3d 381, citing
 
 State v. Taylor,
 
 93-2201 (La.2/28/96), 669 So.2d 364,
 
 cert. denied,
 
 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996).
 

 [61]
 

 .
 
 State v. Taylor,
 
 93-2201 at 24-26, 669 So.2d at 377-78.
 

 [62]
 

 .
 
 State v. Plaisance,
 
 00-1858 at 32, 811 So.2d at 1195.
 

 [63]
 

 .
 
 State v. Hailey,
 
 02-1738 at 8-9, 863 So.2d at 569.
 

 [64]
 

 . The record shows that the jury deliberated between five and seven minutes before returning with a guilty verdict.
 

 [65]
 

 . LSA-C.Cr.P. art. 800(A).
 

 [66]
 

 . This was not, however, the prosecution’s theory in this, the second trial.
 

 [67]
 

 . State
 
 v. Decay,
 
 07-966, p. 18 (La.App. 5 Cir. 6/19/08), 989 So.2d 132, 144,
 
 writ denied,
 
 08-1634 (La.4/13/09), 5 So.3d 161.
 

 [68]
 

 .
 
 State v. Marsalis,
 
 04-827, p. 12 (La.App. 5 Cir. 4/26/05), 902 So.2d 1081, 1088.
 

 [69]
 

 . LSA-C.E. art. 402.
 

 [70]
 

 . LSA-C.E. art. 403.
 

 [71]
 

 .
 
 State v. Castro,
 
 09-887, p. 18 (La.App. 5 Cir. 5/25/10), 40 So.3d 1036, 1049,
 
 writ denied,
 
 10-1323 (La.1/7/11), 52 So.3d 884.
 

 [72]
 

 .
 
 State v. Arita,
 
 04-39, p. 9 (La.App. 5 Cir. 3/1/05), 900 So.2d 37, 43,
 
 writ denied,
 
 05-843 (La.11/29/05), 916 So.2d 165.
 

 [73]
 

 .
 
 State v. Cosey,
 
 97-2020, p. 3 (La.11/28/00), 779 So.2d 675, 678,
 
 cert. denied,
 
 533 U.S. 907, 121 S.Ct. 2252, 150 L.Ed.2d 239 (2001);
 
 State v. Brooks,
 
 01-864, p. 9 (La.App. 5 Cir. 1/29/02), 807 So.2d 1090, 1099.
 

 [74]
 

 .
 
 Id.
 

 [75]
 

 .
 
 State v. Taylor,
 
 07-93, p. 30 (La.App. 5 Cir. 11/27/07), 973 So.2d 83, 102,
 
 writ denied,
 
 07-2454 (La.5/9/08), 980 So.2d 688.
 

 [76]
 

 .
 
 State v. Copeland,
 
 93-544, p. 5 (La.App. 5 Cir. 1/25/94), 631 So.2d 1223, 1226,
 
 writ denied,
 
 94-417 (La.5/20/94), 637 So.2d 477, citing
 
 State v. Prestridge,
 
 399 So.2d 564 (La.1981).
 

 [77]
 

 . LSA-C.E. art. 801.
 

 [78]
 

 . The undated, unsigned diagram, D-7 or Defense Proffer 3, has the word "Taxi” written at the top. The diagram contains many words, including "bullet holes, window, side
 
 *320
 
 panel, rear seat” with arrows pointing to four dots — two on the passenger side and two on the back seat. It is unclear from the diagram whether the bullets holes were made by bullets traveling from the outside of the cab to the inside or from the inside of the cab going outside of it. Considering the foregoing, it appears that the diagram would have been more prejudicial and confusing than probative.
 

 [79]
 

 .
 
 State v. Simmons,
 
 00-35, p. 4 (La.App. 5 Cir. 7/25/00), 767 So.2d 860, 861.
 

 [80]
 

 .
 
 State v. Smith,
 
 39,698, p. 13 (La.App. 2 Cir. 6/29/05), 907 So.2d 192, 199.
 

 [81]
 

 . 631 A.2d 1186 (D.C.1993).
 

 [82]
 

 .
 
 See also Harris v. United States,
 
 834 A.2d 106 (D.C.2003) and the cases cited therein.
 
 But see, United States v. Lopez-Ortiz,
 
 648 F.Supp.2d 241, 246 (D.Puerto Rico 2009) ("The admissibility of government statements as admissions of party opponents has been controversial, provoking a split among the circuits."), and
 
 Bellamy v. State,
 
 403 Md. 308, 941 A.2d 1107, 1114-17 (2008), acknowledging a split among the federal circuits, the states, and the District of Columbia on this issue.
 

 [83]
 

 .
 
 State v. Ayo,
 
 08-468, p. 17 (La.App. 5 Cir. 3/24/09), 7 So.3d 85, 97,
 
 writ denied,
 
 09-1026 (La.3/5/10), 28 So.3d 1006.
 

 [84]
 

 . LSA-C.E. art. 611 D.
 

 [85]
 

 .
 
 Id.
 

 [86]
 

 .
 
 State v. Brooks,
 
 94-1031, p. 8 (La.App. 5 Cir. 5/30/95), 656 So.2d 772, 775.
 

 [87]
 

 . With respect to the three other witnesses found in the record, Glenn Toca, Louise Wal-zer, and Don Carson, defendant did not specify exactly how the trial judge erred by
 
 *323
 
 denying recross-examination during their testimonies.
 

 [88]
 

 . LSA-C.E. art. 801.
 

 [89]
 

 . LSA-C.E. art. 802.
 

 [90]
 

 .
 
 State v. Martin,
 
 458 So.2d 454, 460 (La.1984);
 
 State v. Sarrio,
 
 01-543, p. 17 (La.App. 5 Cir. 11/27/01), 803 So.2d 212, 223,
 
 writ denied,
 
 02-0358 (La.2/7/03), 836 So.2d 86.
 

 [91]
 

 . State v. Hester,
 
 99-426, p. 17 (La.App. 5 Cir. 9/28/99), 746 So.2d 95, 107,
 
 writ denied,
 
 99-3217 (La.4/20/00), 760 So.2d 342.
 

 [92]
 

 .
 
 State v. Seals,
 
 95-305 at 6, 684 So.2d at 374.
 

 [93]
 

 .
 
 State v. Seals,
 
 09-K-192 (La.App. 5 Cir. 3/13/09) (unpublished writ disposition).
 

 [94]
 

 . An appellate court's denial of supervisory writs does not bar reconsideration of an issue on appeal, nor does it prevent the appellate panel from reaching a different conclusion on the issue.
 
 In re K.R.W., Jr.,
 
 03-1371, p. 4 (La.App. 5 Cir. 5/26/04), 875 So.2d 903, 905. Reconsideration of a prior ruling is warranted when, in light of a subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results.
 
 Id.
 
 Judicial efficiency demands that this Court accord great deference to its prior rulings.
 
 State v. Davis,
 
 03-488, p. 6 (La.App. 5 Cir. 11/12/03), 861 So.2d 638, 641 n. 2,
 
 writ denied,
 
 03-3401 (La.4/2/04), 869 So.2d 874.
 

 [95]
 

 .
 
 State v. Hills,
 
 379 So.2d 740, 743-44 (La.1980).
 

 [96]
 

 .
 
 Strickland v. Washington,
 
 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984);
 
 State v. Soler,
 
 93-1042, p. 9 (La.App. 5 Cir. 4/26/94), 636 So.2d 1069, 1075,
 
 writs denied,
 
 94-0475 (La.4/4/94), 637 So.2d 450 and 94-1361 (La.11/4/94), 644 So.2d 1055.
 

 [97]
 

 .
 
 Strickland v. Washington,
 
 466 U.S. at 687, 104 S.Ct. at 2064;
 
 State v. Serio,
 
 94-131, p. 4 (La.App. 5 Cir. 6/30/94), 641 So.2d 604, 607,
 
 writ denied,
 
 94-2025 (La.12/16/94), 648 So.2d 388.
 

 [98]
 

 .
 
 Strickland v. Washington,
 
 466 U.S. at 694, 104 S.Ct. at 2068.
 

 [99]
 

 .
 
 State v. Taylor,
 
 04-346, p. 10 (La.App. 5 Cir. 10/26/04), 887 So.2d 589, 595.
 

 [100]
 

 .
 
 State v. Ayo, supra.
 

 [101]
 

 .
 
 State ex rel. Seals v. State,
 
 00-2738 at 2-9, 831 So.2d at 831-35.
 

 [102]
 

 . 09-192 (La.App. 5 Cir. 3/13/09) (unpublished writ application).
 

 [103]
 

 .
 
 Crawford v. Washington,
 
 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
 

 [104]
 

 .
 
 State v. Seals,
 
 07-K-184 (La.App. 5 Cir. 5/1/07) (unpublished writ disposition).
 

 [105]
 

 . LSA-C.E. art. 804(B)(2).
 

 [106]
 

 .
 
 State v. Ramirez,
 
 09-350, p. 16 (La.App. 5 Cir. 12/29/09), 30 So.3d 833, 845, citing
 
 State v. Verrett,
 
 419 So.2d 455, 457 (La.1982).
 

 [107]
 

 .
 
 Id.
 

 [108]
 

 .
 
 State v. Odoms,
 
 01-1033, p. 10 (La.App. 5 Cir. 3/26/02), 815 So.2d 224, 230-31,
 
 writ denied,
 
 02-1185 (La.11/22/02), 829 So.2d 1037.
 

 [109]
 

 .
 
 See State v. Ramirez,
 
 09-350, pp. 22-23 (La.App. 5 Cir. 12/29/09), 30 So.3d 833, 848, where this Court found the victim's statement was admissible as a dying declaration based in part on the fact that the victim was on her knees praying, which suggested she was aware of her condition.
 

 [110]
 

 . LSA-C.Cr.P. art. 841;
 
 State v. Enclard,
 
 03-283, p. 11 (La.App. 5 Cir. 6/19/03), 850 So.2d 845, 853.
 

 [111]
 

 .
 
 State v. Ayo,
 
 08-468, pp. 29-30 (La.App. 5 Cir. 3/24/09), 7 So.3d 85, 104,
 
 writ denied,
 
 09-1026 (La.3/5/10), 28 So.3d 1006.
 

 [112]
 

 . 01-1638 (La.1/14/03), 838 So.2d 729,
 
 cert. denied,
 
 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004).
 

 [113]
 

 .
 
 Id.,
 
 01-1638 at 27-29, 838 So.2d at 751-52.
 

 [114]
 

 .LSA-C.Cr.P. art. 841;
 
 State v. Yrle,
 
 04-900, pp. 7-8 (La.App. 5 Cir. 3/29/05), 901 So.2d 470, 474,
 
 writ denied,
 
 05-2160 (La.5/5/06), 927 So.2d 306.
 

 [115]
 

 . 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).
 

 [116]
 

 .
 
 State v. Horton,
 
 09-250, p. 13 (La.App. 5 Cir. 10/27/09), 28 So.3d 370, 378, citing
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963).
 

 [117]
 

 .
 
 Horton,
 
 09-250 at 13, 28 So.3d at 378, citing
 
 Arizona v. Youngblood,
 
 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988).
 

 [118]
 

 . 467 U.S. 479, 488-89, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984).
 

 [119]
 

 . Of note, during defense counsel's closing argument at the first trial, defense counsel admitted there was no trip log indicating that the victim had earned money that day, and that the victim did not keep a record of what he was doing.
 

 [120]
 

 .Lt. Joseph Picone testified that he took note of what was inside of the wallet before he returned it to Mr. Feeney's wife. A two-dollar bill, some change, credit cards, a social security card, a voter registration card, a cab driver permit, and a blood donor card were found in Mr. Feeney's wallet.
 

 [121]
 

 .
 
 State v. Bailey,
 
 97-493, p. 7 (La.App. 5 Cir. 11/12/97), 703 So.2d 1325, 1330,
 
 writ denied,
 
 00-908 (La.4/20/01), 790 So.2d 13.
 

 [122]
 

 . 99-906 (La.App. 5 Cir. 2/29/00), 757 So.2d 115,
 
 writ denied,
 
 00-0908 (La.4/20/01), 790 So.2d 13,
 

 [123]
 

 .
 
 Id.,
 
 99-906 at 20-21, 757 So.2d at 129-30.
 

 [124]
 

 . 412 So.2d 1013 (La.1982).
 

 [125]
 

 .
 
 Id.,
 
 412 So.2d at 1019-20.
 

 [126]
 

 .LSA-C.Cr.P. art. 765(7); LSA-C.Cr.P. art. 801.
 
 See also, State v. Brown,
 
 245 La. 112, 157 So.2d 459, 460 (1963) (defendant’s request that the trial court charge the jury before the first witness was sworn and before any evidence was introduced was properly refused).
 

 [127]
 

 . 570 So.2d 185 (La.App. 5 Cir.1990),
 
 writ denied,
 
 575 So.2d 386 (La.1991).
 

 [128]
 

 .
 
 Id.,
 
 570 So.2d at 190-91.
 

 [129]
 

 .
 
 State v. Hollins,
 
 08-1033, p. 3 (La.6/26/09), 15 So.3d 69, 71.
 

 [130]
 

 .
 
 Id.; State v. Smith,
 
 04-340, p. 11 (La.App. 5 Cir. 10/26/04), 888 So.2d 280, 289.
 

 [131]
 

 . LSA-C.Cr.P. art. 807;
 
 State v. Guillot,
 
 470 So.2d 360 (La.App. 5 Cir.1985),
 
 writ denied,
 
 476 So.2d 347 (La.1985), citing
 
 State v. Simmons,
 
 422 So.2d 138 (La.1982).
 

 [132]
 

 . 07-473 (La.App. 5 Cir. 11/27/07), 973 So.2d 782.
 

 [133]
 

 .
 
 Id.,
 
 07-473 at 13-14, 973 So.2d at 789-90.
 

 [134]
 

 .
 
 State v. Terrell,
 
 08-1189, p. 12 (La.App. 5 Cir. 2/25/09), 9 So.3d 245, 252,
 
 writ denied,
 
 09-657 (La.12/18/09), 23 So.3d 931.
 

 [135]
 

 . LSA-C.Cr.P. art. 807.
 

 [136]
 

 . 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990),
 
 overruled in part by, Estelle v. McGuire,
 
 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).
 

 [137]
 

 . 01-2730 (La.1/19/05), 892 So.2d 1238,
 
 cert. denied,
 
 546 U.S. 848, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005).
 

 [138]
 

 .
 
 Id.,
 
 01-2730 at 67-68, 892 So.2d at 1261.
 

 [139]
 

 .
 
 State v. Porter,
 
 93-1106, p. 4 (La.7/5/94), 639 So.2d 1137, 1140, n. 5.
 

 [140]
 

 . 38,524 (La.App. 2 Cir. 11/23/04), 889 So.2d 335,
 
 writ denied,
 
 04-3186 (La.4/8/05), 899 So.2d 2,
 
 cert. denied,
 
 546 U.S. 939, 126 S.Ct. 431, 163 L.Ed.2d 327 (2005).
 

 [141]
 

 .
 
 Id.,
 
 38,524 at 22-23, 889 So.2d at 351-52.
 

 [142]
 

 . 96-661, pp. 8-9 (La.App. 5 Cir. 4/9/97), 694 So.2d 440, 446,
 
 writs denied,
 
 97-1050 (La.10/13/97), 703 So.2d 609; 97-1255 (La.10/13/97), 703 So.2d 612; and 04-264 (La.3/18/05), 896 So.2d 991.
 

 [143]
 

 . 570 So.2d 185 (La.App. 5 Cir.1990),
 
 writ denied,
 
 575 So.2d 386 (La.1991).
 

 [144]
 

 . 544 So.2d 1188 (La.App. 5 Cir.1989),
 
 writ denied,
 
 550 So.2d 627 (La.1989).
 

 [145]
 

 .
 
 State v. Martin,
 
 04-924, pp. 8-9 (La.App. 5 Cir. 1/25/05), 895 So.2d 55, 60, citing
 
 Victor v. Nebraska,
 
 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994).
 

 [146]
 

 .
 
 Id.,
 
 04-924 at 9, 895 So.2d at 60.
 

 [147]
 

 .
 
 Id.,
 
 04-924 at 9, 895 So.2d at 60, citing
 
 State v. West,
 
 568 So.2d 1019, 1023 (La.1990).
 

 [148]
 

 .
 
 Id.,
 
 04-924 at 9, 895 So.2d at 60, citing
 
 State v. Motion,
 
 395 So.2d 1337, 1348 (La.1981), ce
 
 rt. denied,
 
 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed.2d 139 (1981).
 

 [149]
 

 . The Louisiana Supreme Court has held that under well settled principles, the responsive verdicts provided by the procedural law in effect at the time of trial apply, and not those provided by the prior procedural law as it had existed at the time of the crime.
 
 State v. Martin,
 
 351 So.2d 92, 93 (La.1977).
 

 [150]
 

 . LSA-R.S. 14:12.
 

 [151]
 

 .
 
 State v. Roussel,
 
 00-192, p. 15 (La.App. 5 Cir. 7/25/00), 767 So.2d 811, 817-18,
 
 writ denied,
 
 00-2558 (La.10/5/01), 798 So.2d 960;
 
 State v. Brown,
 
 96-1002, p. 4 (La.App. 5 Cir. 4/9/97), 694 So.2d 435, 437,
 
 writ denied, 97-1310
 
 (La.10/31/97), 703 So.2d 19;
 
 State v. Patomo,
 
 01-2585 (La.App. 1 Cir. 6/21/02), 822 So.2d 141.
 

 [152]
 

 .
 
 State v. Seals,
 
 08-K-730 (La.App. 5 Cir.10/14/08) (unpublished writ disposition).
 

 [153]
 

 .
 
 State v. Plaisance,
 
 01-1040, p. 3 (La.App. 5 Cir.3/26/02), 815 So.2d 272, 274.
 

 [154]
 

 .
 
 State v. Joshlin,
 
 99-1004, p. 4 (La.1/19/00), 752 So.2d 834, 837.
 

 [155]
 

 .Id.
 

 [156]
 

 .
 
 Terry v. Ohio,
 
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
 

 [157]
 

 .
 
 State v. Addison,
 
 05-378, p. 9 (La.App. 5 Cir.12/27/05), 920 So.2d 884, 890,
 
 writ denied,
 
 06-1087 (La.11/9/06), 941 So.2d 36.
 

 [158]
 

 .
 
 State v. Boss,
 
 04-457, p. 5 (La.App. 5 Cir. 10/26/04), 887 So.2d 581, 585.
 

 [159]
 

 . LSA-C.Cr.P. art. 703(D).
 

 [160]
 

 .
 
 State v. Addison,
 
 05-378 at 8-9, 920 So.2d at 890.
 

 [161]
 

 . LSA-C.Cr.P. art. 215.1;
 
 Terry v. Ohio,
 
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968);
 
 State v. Belton, 441
 
 So.2d 1195, 1198 (La.1983),
 
 cert. denied,
 
 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984).
 

 [162]
 

 .
 
 State v. Massey,
 
 03-1166, p. 4 (La.App. 5 Cir. 1/27/04), 866 So.2d 965, 968.
 

 [163]
 

 .
 
 State v. Burns,
 
 04-175, p. 5 (La.App. 5 Cir. 6/29/04), 877 So.2d 1073, 1076.
 

 [164]
 

 . LSA-C.Cr.P. art. 703(D).
 

 [165]
 

 .
 
 State v. Franklin,
 
 03-287, p. 4 (La.App. 5 Cir. 9/16/03), 858 So.2d 68, 70,
 
 writ denied,
 
 03-3062 (La.3/12/04), 869 So.2d 817;
 
 see also
 
 LSA-R.S. 15:451.
 

 [166]
 

 .
 
 State v. Franklin,
 
 858 So.2d at 70.
 

 [167]
 

 . Their testimony at the suppression hearing was very similar to their trial testimony.
 

 [168]
 

 .
 
 State v. Seals,
 
 95-305 at 16, 684 So.2d at 379.
 

 [169]
 

 .
 
 Id.
 

 [170]
 

 .
 
 Id.,
 
 95-305 at 16, 684 So.2d at 380.
 

 [171]
 

 .
 
 State v. Rowan,
 
 97-21, p. 7 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.
 

 [172]
 

 . The Louisiana Supreme Court in
 
 Seals
 
 noted that the trial judge had found credible the testimony of those witnesses whose representations supported adequate grounds for the stop, timely
 
 Miranda
 
 warnings, lack of coercion and lack of promises. The Supreme Court recognized its obligation to apply a standard of review which required it to leave undisturbed a trial court’s conclusions as to the credibility of witnesses and the weight of testimony relating to the voluntary nature of a confession unless they were not supported by the evidence. By that standard, the Supreme Court concluded that the assignment lacked merit.
 
 State v. Seals,
 
 95-305 at 16-17, 684 So.2d at 380.
 

 [173]
 

 .State ex rel. Seals v. State,
 
 00-2738 (La.10/25/02), 831 So.2d 828.
 

 [174]
 

 . 07-887 (La.App. 5 Cir. 5/12/09), 13 So.3d 677,
 
 judgment reversed on other grounds,
 
 09-1304 (La.4/5/10), 32 So.3d 227.
 

 [175]
 

 .
 
 Id.,
 
 07-887 at 3, 13 So.3d at 681 n. 8.
 

 [176]
 

 .
 
 State v. Cavazos,
 
 610 So.2d 127 (La.1992) (per curiam);
 
 State v. Cedrington,
 
 98-253, p. 11 (La.App. 5 Cir. 12/16/98), 725 So.2d 565, 572,
 
 writs denied,
 
 99-0190 (La.6/4/99), 743 So.2d 1249, and 99-0431 (La.6/25/99), 745 So.2d 1182.
 
 (See also Deloch v. Whitley,
 
 96-1901 (La.11/22/96), 684 So.2d 349 (per curiam), where the Supreme Court found that defense counsel’s failure to file a motion to quash the indictment based on the allegedly discriminatory selection of grand jury forepersons waived petitioner's equal protection claim.)
 

 [177]
 

 .
 
 State v. Alo,
 
 06-473, p. 6 (La.App. 5 Cir. 12/27/06), 948 So.2d 275, 278.
 
 See also State v. Freeman,
 
 37,312, pp. 3-4 (La.App. 2 Cir. 7/16/03), 850 So.2d 1088, 1090,
 
 writ denied,
 
 03-2466 (La.2/6/04), 865 So.2d 740.
 

 [178]
 

 . LSA-C.Cr.P. art. 487;
 
 State v. Davis,
 
 385 So.2d 193, 196 (La.1980).
 

 [179]
 

 .
 
 State v. Edwards,
 
 287 So.2d 518, 525 (La.1973).
 

 [180]
 

 .
 
 State v. Wright,
 
 40,945, p. 11 (La.App. 2 Cir. 5/19/06), 931 So.2d 432, 442,
 
 writ denied,
 
 06-1727 (La.3/16/07), 952 So.2d 694.
 

 [181]
 

 .
 
 See State v. Davis,
 
 385 So.2d at 197.
 

 [182]
 

 . 517 So.2d 346 (La.App. 1 Cir.1987).
 

 [183]
 

 .
 
 Domingue,
 
 517 So.2d at 349.
 

 [184]
 

 .
 
 Domingue,
 
 517 So.2d at 347 n. 1.
 

 [185]
 

 .See State v. Johnson,
 
 08-1156 (La.App. 5 Cir. 4/28/09), 9 So.3d 1084,
 
 writ denied,
 
 09-1394 (La.2/26/10), 28 So.3d 268, where this Court found that defendant's failure to object to the amendment of the bill of information and/or to request a continuance to prepare a defense to the amended charges precluded relief on this claim.
 
 Id.,
 
 08-1156 at 11-12, 9 So.3d at 1092.
 

 [186]
 

 . 499 So.2d 376 (La.App. 4 Cir.1986).
 

 [187]
 

 .
 
 Id.,
 
 at 380.
 

 [188]
 

 . 96-58 (La.App. 3 Cir. 10/9/96), 684 So.2d 416, 421,
 
 writ denied,
 
 97-508 (La.9/5/97), 700 So.2d 503, and
 
 cert. denied, 522
 
 U.S. 1002, 118 S.Ct. 573, 139 L.Ed.2d 412 (1997).
 

 [189]
 

 .
 
 State v. Ayo,
 
 08-468, pp. 29-30 (La.App. 5 Cir. 3/24/09), 7 So.3d 85, 104,
 
 writ denied, 09-
 
 1026 (La.3/5/10), 28 So.3d 1006.
 

 [190]
 

 .
 
 State v. Ayo,
 
 citing
 
 State v. Draughn,
 
 05-1825, p. 70 (La.1/17/07), 950 So.2d 583, 629,
 
 cert. denied,
 
 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007).
 

 [191]
 

 . 03-1982 (La.10/19/04), 885 So.2d 1044,
 
 cert. denied,
 
 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005).
 

 [192]
 

 . 808 F.2d 1143, 1147 (5th Cir.1987).
 

 [193]
 

 .
 
 State v. Ayo,
 
 08-468 at 30, 7 So.3d at 104.
 

 [194]
 

 . 312 So.2d 337 (La.1975).
 

 [195]
 

 . 556 So.2d 175 (La.App. 5 Cir.1990).